[Nos. 18493-1-II; 20327-8-II.    Division Two.    May 16, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. SEAN
CHRISTIAN DAVIS, *Appellant*.

*Robert M. Quillian* and *Thomas E. Doyle*, for appellant (appointed counsel for appeal).

*Bernardean Broadous, Prosecuting Attorney*, and *Robert A. Lund, Deputy*, for respondent.

416

Seinfeld, J. — Sean Davis appeals six convictions for drug, firearm, and witness tampering offenses. He claims that the police violated his privacy rights when they entered his motel room without a warrant and that, consequently, the trial court erred when it denied his motion to suppress the evidence discovered in the motel room. We hold that the trial court properly relied upon the medical emergency exception in denying the suppression motion. Thus, we affirm.

## FACTS

According to Laura Cochran, the manager of a Lacey motel, Davis checked into her motel under the name "Shad Bruce" sometime between 11:00 p.m. on October 22 and 7:00 a.m. on October 23, 1993. Although the motel check-out time was 12 noon and there was a notice to this effect on the front desk, Davis paid his bill for the evening of October 23 between 3:00 p.m. and 11:00 p.m. that day; he paid for the evenings of October 24 and 25 between 3:00 p.m. and 11:00 p.m. on October 25. He continued to occupy the room until his arrest in the early afternoon of October 26.

Davis was not a model guest. Motel personnel discovered that he was sharing his room with a rottweiler for which he had not paid the posted $25 pet deposit. When Cochran went to Davis's room on October 25 to ask for the deposit, Davis answered the door, holding the dog by its collar. He claimed that he did not have the money, but that his girlfriend's relative would pay. But the motel did not receive the deposit.

At 11:00 the next morning, Cochran telephoned Davis to inquire about the pet deposit and to determine whether he intended to stay another night. Davis did not answer. Cochran then knocked on the door of his room. Although the inside dead-bolt lock was secured, no one answered.

The motel's head housekeeper, Shirley Toulou, testified that shortly after noon on October 26, her cleaning staff reported that Davis's room was still occupied. Because it was after check-out time, Toulou, following motel policy, asked the front desk to call Davis to inquire whether he intended to stay another night. When Davis did not answer the call, Toulou knocked on the door and identified herself. When there still was no answer, Toulou asked Cochran to call 9-1-1. Toulou testified that she asked Cochran to make the call "to see what [was] going on in the room, if there is a death or—you know, because we have had that problem before."

Sergeant Lyon and Officer Brimmer arrived at the motel at approximately 12:20 p.m. Toulou and Cochran explained that the room appeared to be occupied, but that no one responded to their repeated attempts to make contact by telephone and in person. They said that they were concerned for the occupants' safety, but did not want to investigate by themselves because they were afraid of the dog.

Sergeant Lyon went to the motel room door and found the dead bolt partially engaged. He knocked loudly, identifying himself as a police officer. No one responded, but Lyon heard a dog sniffing on the other side of the door. Sergeant Lyon, recalling an earlier occasion when he had entered an unresponsive motel guest's room and found the guest in need of medical attention due to a drug overdose, was concerned.

Believing that the room's occupant might need medical assistance, Sergeant Lyon used a passkey to open the door. When there was no response to his loud call, he and Officer Brimmer entered the room. They found Davis and a minor female, E.S., in separate beds. They also observed "numerous homemade pipes, bongs, and plastic tubing, and a black tray with lines of white powder."

When the officers' attempts to arouse Davis and E.S. verbally were unsuccessful, Officer Brimmer woke Davis by shaking him. E.S. woke moments later. The officers

then explained the reason for their presence and asked Davis and E.S. for consent to search the room. E.S. consented immediately. Davis initially refused, claiming that he lacked authority because the room was in Shad Bruce's name, but withdrew his objection when motel employees confirmed that Davis fit Shad Bruce's description. He and E.S. then signed written consent forms.

During the search, the officers found drug paraphernalia, rock cocaine, and a loaded handgun. They also found used videotapes and a video camera aimed at the bed. The videotapes documented Davis, E.S. and another female smoking drugs and Davis loading and aiming a handgun at E.S.'s head.

Based on this evidence, the State charged Davis with the instant offenses. Davis moved to suppress the evidence. In denying the motion, the trial court relied upon two alternative grounds. First, it concluded that the officers' entry into Davis's motel room fell within the medical emergency exception to the warrant requirement. Second, it found that Davis did not have a reasonable expectation of privacy in the room because his tenancy had expired before the police entered. A jury then convicted Davis as charged.[1]

On appeal, Davis argues that the evidence seized from his room was the product of an unlawful search because (1) the expiration of his tenancy did not give motel personnel the authority to consent to the search and (2) the officers did not have an objectively reasonable belief that there was a medical emergency. He also argues that the warrantless viewing of the videotapes exceeded the scope of his consent. In a consolidated appeal, Davis argues that his drug convictions, which were entered after a civil forfeiture, constituted double punishment for the same crime

---

[1]Before Davis's criminal trial began, the Thurston County Superior court entered a civil forfeiture order against property Davis allegedly had acquired through illicit drug activity. *In re 1989 Chevrolet Camaro*, No. 93-6710 LPD (Thurston County Superior Court, April 18. 1993) (order of forfeiture pursuant to RCW 69.50.505).

and violated state and federal constitutional prohibitions against double jeopardy.

# I

## The Search

### A. Expiration of Tenancy

Generally, a motel guest has the same expectation of privacy during his tenancy as the owner or renter of a private residence. *Stoner v California*, 376 U.S. 483, 486, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964); *State v. York*, 11 Wn. App. 137, 141, 521 P.2d 950 (1974). This expectation, however, does not survive the expiration of the tenancy, unless the motel has accepted late payment and/or tolerated overtime stays in the past. *People v. Montoya*, 914 P.2d 491, 492 (Colo. Ct. App. 1995); *see United States v. Owens*, 782 F.2d 146, 150 (10th Cir. 1986) (subtle distinctions of landlord-tenant law do not control Fourth Amendment; defendant's reasonable expectation of privacy does not automatically expire at check-out time); *United States v. Watson*, 783 F. Supp. 258, 263 (E.D. Va. 1992) (defendant retained reasonable expectation of privacy in hotel room after check-out time when hotel regularly accepted defendant's late rental payment).

Here, the warrantless entry occurred less than an hour after the noon check-out time. But the motel had previously accepted rental payments from Davis at least three hours late and had tolerated his overstays. Under these circumstances, we find that Davis had a reasonable expectation of privacy in his room at the time the police entered.[2]

---

[2]These facts are distinguishable from circumstances where criminal defendants have been detained elsewhere and, therefore, have failed to retrieve their belongings before the tenancy expires. In such instances, the innkeeper acquires the right to control the premises at the expiration of the tenancy and can consent to a warrantless search by law enforcement. *See State v. Roff*, 70 Wn.2d 606, 611-12, 424 P.2d 643 (1967) (motel manager can authorize police to enter motel room where tenant, who was known to be absent, had not paid the rent for a 24-hour period); *United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir.

## B. Medical Emergency Exception

The fourth amendment of the United States Constitution and article I, section 7 of the Washington State Constitution prohibit unreasonable searches and seizures. Warrantless searches, subject to certain narrowly construed exceptions, are per se unreasonable. *State v. Swenson*, 59 Wn. App. 586, 588, 799 P.2d 1188 (1990). As Davis had a constitutionally protected privacy interest in the motel room, the next question is whether the medical emergency exception to the warrant requirement applies here.

██ █ The medical emergency exception allows a police officer to enter a dwelling without a warrant for purposes of rendering emergency aid and assistance to a person he reasonably believes is in need of such assistance. *State v. Muir*, 67 Wn. App. 149, 153, 835 P.2d 1049 (1992). But the State must prove that "(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched." *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994) (quoting *State v. Gocken*, 71 Wn. App. 267, 276-77, 857 P.2d 1074 (1993)), *review denied,* 125 Wn.2d 1021 (1995). Further, the officer must " 'be able to point to specific and articulable facts" and reasonable inferences drawn therefrom, that provide reasonable justification for the warrantless entry. *State v. Sanders*, 8 Wn. App. 306, 310, 506 P.2d 892 (1973) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). The court looks to the totality of the circumstances. *State v. Bean*, 89 Wn.2d 467, 472, 572 P.2d 1102 (1978).

---

1992) ("[an absent] guest in a motel has no reasonable expectation of privacy in a room after the rental period has expired"); *see also State v. Christian*, 95 Wn.2d 655, 660-61, 628 P.2d 806 (1981) (landlord's consent to search valid after tenant communicated his intent to vacate property, landlord informed tenant that he planned to enter property at a particular time, and the landlord saw the tenant move belongings from the property at an earlier date).

Davis limits his challenge to the second prong of the test—whether the officers had an objectively reasonable belief that there was an emergency. We conclude that the totality of the evidence was sufficient to create an objectively reasonable belief that there was an emergency situation: (1) the dead bolt to Davis's standard motel room was activated from the inside, (2) the occupant did not respond to repeated telephone calls and knocks at the door throughout the late morning and early afternoon of October 26, and (3) it was after check-out time. These facts and the rational inferences one can draw from them support the reasonable conclusion that the occupant of Davis's motel room may well have needed immediate medical attention.

Analogizing this case to *Swenson*, 59 Wn. App. 586, Davis contends that the above information is innocuous. In *Swenson*, the police responded to an early morning report from Swenson's neighbor that Swenson's front door was ajar. When the police arrived, they spoke to the neighbor, who indicated that the house appeared to be unoccupied. Approaching the house, the officers heard a dog barking and noticed that there was no vehicle in the driveway. At the front door, the police called into the house, but received no response. They then drew their weapons and conducted a room by room search. During the search, they discovered drugs and drug paraphernalia belonging to Swenson.

The appellate court reversed Swenson's conviction for possession with intent to deliver. Finding the warrantless search to be objectively unreasonable, the *Swenson* court noted that the police did not have any cause to believe that the house was occupied, did not receive a call reporting an injured person, did not find signs of forced entry, and did not employ less intrusive investigative measures to determine whether their suspicions were well-founded. Evidence of a "door left open late on a summer night" was not sufficient. *Swenson*, 59 Wn. App. at 590.

The facts here are distinguishable from *Swenson* in that

the reports from the motel personnel and the partially engaged dead bolt supported the officers' belief that the motel room was occupied. Further, motel personnel reported that the occupant had been unresponsive for over an hour and that guests usually contacted the office before check-out time. Further, Sergeant Lyon and the head housekeeper, Toulou, considered this objective evidence in light of other medical emergencies they had encountered under similar circumstances in the past. *Cf. State v. Goodin*, 67 Wn. App. 623, 631, 838 P.2d 135 (1992) (" '[c]ircumstances that might appear innocuous to the average person may appear incriminating to a police officer in light of past experience, and the officer may bring that experience to bear on a situation' ") (quoting *State v. Thierry*, 60 Wn. App. 445, 448, 803 P.2d 844 (1991)).

We note that the facts here are not as compelling as those in many cases upholding the use of the medical emergency exception to justify a warrantless search. *See State v. Lynd,* 54 Wn. App. 18, 23, 771 P.2d 770 (1989) (after receiving a hang-up 9-1-1 call, " '[the officer] would have been derelict in her duty as a police officer in not entering the residence to check on [a known victim of domestic violence].' "); *Gocken,* 71 Wn. App. at 277 (inability to contact victim for several weeks coupled with victim's advanced age and mental and physical affirmities justified warrantless entry). But they are more compelling than the facts in cases such as *Swenson* that have rejected application of the exception. *See also United States v. Moss,* 963 F.2d 673, 679 (4th Cir. 1992) (officer did not have reasonable objective belief that medical emergency warranted entry into forest service cabin, given that occupants were not present and fresh bicycle tracks leading from cabin suggested that they were in good health); *People v. Davis,* 442 Mich. 1, 27, 497 N.W.2d 910 (1993) (medical emergency exception not applicable when police entered motel room after receiving an unconfirmed report of gunfire coming from one of two possible rooms and occupant looked out window but refused to open the door); *State v. Othoudt,* 482 N.W.2d 218, 223 (Minn. 1992) (medical emergency

exception inapplicable where occupant denied entry and police had prior knowledge that medical aid was being administered). We conclude that the facts here are minimally sufficient for application of the exception. Consequently, we do not address the alternative argument that this search falls within the consent exception.

## C. Scope of Consent

Davis also contends that his oral and written consent to search the room did not extend to the contents of the used videotapes. He argues that the police engaged in an unreasonable search when they viewed the tapes without first securing a warrant.

■ ■ The scope of a consent search is limited by the authority granted by the consenting party. *State v. Cotten*, 75 Wn. App. 669, 679, 879 P.2d 971 (1994), *review denied*, 126 Wn.2d 1004 (1995). "Any 'express or implied limitations or qualifications' may reduce the scope of consent in duration, area, or intensity." *Cotten*, 75 Wn. App. at 679 (quoting 3 Wayne R. LaFave, Search and Seizure § 8.1(c), at 160 (2d ed. 1987)). Exceeding the scope of consent is comparable to exceeding the scope of a search warrant. *Cotten*, 75 Wn. App. at 680.

Here, Davis's written consent form provided, in pertinent part,

> Knowing of my lawful right to refuse to consent to such a search, I willingly give my permission to the above named officer(s) to conduct a complete search of the premises and property, including all buildings and vehicles, both inside and outside of the property located at 4615 Martin Way 207[.]

> The above said officer(s) further have my permission to take from my premises and property any letters, papers, materials or any other property or things which they desire as evidence for criminal prosecution in the case or cases under investigation.

By signing this document, Davis expressly granted to

the police the authority to search and seize virtually any materials they reasonably believed to be evidence of criminal activity. Further, there is no evidence in the record supporting Davis's contention that he limited the scope of his consent to only those materials the officers could see without the benefit of a video player. Given other evidence of illegal activity in the room, the officers reasonably believed that the videotapes might contain incriminating images. They did not exceed the scope of the written consent when they seized the tapes and viewed their contents.

## II

### Double Jeopardy

■ Finally, Davis claims that the State violated his constitutional rights against double jeopardy by bringing criminal charges after it had already punished him once through civil forfeiture proceedings. But the United States Supreme Court has clarified that civil forfeitures do not constitute "punishment" for purposes of double jeopardy analysis unless they are " 'so punitive either in purpose or effect' as to be equivalent to a criminal proceeding." *United States v. Ursery*, 518 U.S. 267, 116 S. Ct. 2135, 2148 n.3, 135 L. Ed. 2d 549 (1996) (quoting *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 365, 104 S. Ct. 1099, 79 L. Ed. 2d 361 (1984)). Accordingly, criminal prosecution after a civil forfeiture of property generally does not constitute double jeopardy. *Ursery* applies with equal force under state constitutional analysis. *Tellevik v. 6717 100th St. S.W.*, 83 Wn. App. 366, 370-71, 921 P.2d 1088 (1996).

There is no indication that the civil forfeiture order here was "punitive" under the *Ursery* criteria. Thus, the civil forfeiture proceeding did not bar the criminal prosecution.

We affirm.

HOUGHTON, C.J., and ARMSTRONG, J., concur.

Review denied at 133 Wn.2d 1028 (1997).