[No. 24275-3-II. Division Two. January 19, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. DONOVAN QUEDESSA JOHNSON, *Appellant*.

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*) for appellant (appointed counsel for appeal).

*Christopher O. Shea, Prosecuting Attorney*, and *Rick L. Porter, Deputy*, for respondent.

ARMSTRONG, C.J. — Police responded to a domestic violence report. Johnson, the aggressor, exited the house. While one officer was handcuffing and putting Johnson in the patrol car, another officer entered the home after the victim opened the front door. Inside, the officer immediately smelled marijuana. The victim told the officer that she and Johnson had been smoking marijuana; she also showed the officer a marijuana pipe and some residue. The officers then asked Johnson for consent to search the house, threatening to apply for a warrant if he did not consent. Johnson consented and the officers found marijuana. The trial court denied a motion to suppress the evidence because the officer's initial entry was justified under the emergency exception to the warrant requirement, and Johnson appeals. We affirm.

## FACTS

In September 1998, officers responded to a report of domestic violence at a home. The call came from a relative outside the house who reported that the victim had locked herself in the bathroom. Officer Lasnier arrived first and, as he approached the house, Donovan Johnson came out. Lasnier twice asked Johnson if anyone was in the house. Slow to answer, Johnson finally said that his girl friend was still in the bathroom. Johnson had a bloody cut on his wrist, smelled of marijuana, and appeared to be under the influence of marijuana. Lasnier handcuffed Johnson and put him in his patrol car.

In the meantime, Deputy Gary Velie arrived and knocked

on the front door. After several knocks, Babette Markishtum answered. She was shaking and had blood on her lip. It appeared to Deputy Velie that Markishtum was going to come out of the house, but he told her to stay and he walked inside. Deputy Velie immediately smelled marijuana in the house. The trial court found that Deputy Velie entered the house to protect Markishtum and other potential victims, to keep Markishtum and Johnson separate for safety, and to ensure an orderly investigation.

Sergeant Turner also arrived and looked for victims. After asking Markishtum about the domestic violence, the officers asked about the marijuana smell. Markishtum said that she and Johnson had just been smoking marijuana. She showed the officers marijuana paraphernalia, and they noticed a coffee grinder with green residue. The officers asked Markishtum if she would consent to a search of the entire house. She said they would have to ask Johnson because it was not her house.

Sergeant Turner went outside, removed Johnson from Officer Lasnier's patrol car, and read him his rights. Turner then asked if they could search the house. Johnson asked if they needed probable cause. Turner replied that he had probable cause because of what he had seen and smelled and because of what Markishtum had told the officers. Johnson asked whether he could limit the scope of the search, and Turner said that if he did, the officers would apply for a warrant. Turner also told Johnson that he had the right to refuse consent. Johnson eventually said, "[y]ou can look," and he signed a consent form. During the search, the officers found marijuana plants growing in the lower level of the house. The trial court denied Johnson's motion to suppress the evidence of the marijuana grow operation.

## ANALYSIS

### I. Factual Findings

A trial court's findings of fact following a motion to

suppress are verities on appeal if unchallenged. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). Johnson assigns error to the trial court's finding that Deputy Velie did not push his way into Johnson's house. If findings are challenged, we review the record for substantial evidence to support the findings. *Hill*, 123 Wn.2d at 647. Substantial evidence is "a sufficient quantity of evidence ... to persuade a fair-minded, rational person of the truth of the finding." *Hill*, 123 Wn.2d at 644.

The trial court found that Deputy Velie "did not literally push to get into the home but made it certain that he intended to go in the home by walking through the door and not letting [Markishtum] outside." The record contains substantial evidence to support this finding. Deputy Velie testified that he "pushed [his] way into the house." But he later corrected his testimony, stating that "she looked like she was going to step out, [but] I said don't come out and I went on in." Moreover, whether Deputy Velie pushed past Markishtum or simply stepped around her is not the critical issue; rather, the issue is whether Deputy Velie lawfully entered the home without a search warrant.

## II. Emergency Exception

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution prohibit unreasonable searches and seizures. *State v. Davis*, 86 Wn. App. 414, 420, 937 P.2d 1110 (1997). Warrantless searches are per se unreasonable, but the warrant requirement is subject to narrowly drawn exceptions. *Davis*, 86 Wn. App. at 420. The emergency exception recognizes the "community caretaking function of police officers, and exists so officers can assist citizens and protect property." *State v. Menz*, 75 Wn. App. 351, 353, 880 P.2d 48 (1994); *see also Davis*, 86 Wn. App. at 420.

But when the State invokes the emergency exception "we must be satisfied that the claimed emergency was not simply a pretext for conducting an evidentiary search[.]"

*State v. Lynd*, 54 Wn. App. 18, 21, 771 P.2d 770 (1989). Thus, the exception may be invoked only when

> (1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched.

*State v. Gocken*, 71 Wn. App. 267, 276-77, 857 P.2d 1074 (1993). And the officer must be able to articulate facts and reasonable inferences that justify the warrantless search. *Davis*, 86 Wn. App. at 420.

Furthermore, we scrupulously protect a citizen's right to privacy in his or her home, because "[i]n no area is a citizen more entitled to his privacy than in his or her home." *State v. Young*, 123 Wn.2d 173, 185, 867 P.2d 593 (1994). Thus, the home is a "highly private place" and "receives heightened constitutional protection." *Young*, 123 Wn.2d at 185. "For this reason, 'the closer officers come to intrusion into a dwelling, the greater the constitutional protection' ." *Young*, 123 Wn.2d at 185 (quoting *State v. Chrisman*, 100 Wn.2d 814, 820, 676 P.2d 419 (1984)).

Johnson contends that the warrantless search of his home was unconstitutional under both the federal and state constitutions. We first consider the protection the state constitution affords.

A. Article I, Section 7

"It is by now axiomatic that article I, section 7 provides greater protection to an individual's right of privacy than that guaranteed by the Fourth Amendment." *State v. Parker*, 139 Wn.2d 486, 493, 987 P.2d 73 (1999). Unlike the Fourth Amendment, article I, section 7 " 'clearly recognizes an individual's right to privacy with no express limitations.' " *Parker*, 139 Wn.2d at 493 (quoting *State v. White*, 97 Wn.2d 92, 110, 640 P.2d 1061 (1982)). In addition, article I, section 7 affords greater protection from an officer's search of a home than the Fourth Amendment. *See State v. Ferrier*, 136 Wn.2d 103, 111-13, 960 P.2d 927 (1998).

Division One of this Court considered the scope of the emergency exception under the state constitution in *State v. Bakke*, 44 Wn. App. 830, 723 P.2d 534 (1986). The court recognized the "heightened protection of privacy" guaranteed by article I, section 7. *Bakke*, 44 Wn. App. at 840. But the court concluded that "the state interest in protecting its citizens' private property in an emergency situation is consistent with the Fourth Amendment's protection afforded to an individual's privacy rights so that extending the protection under our state constitution is unwarranted."[1] *Bakke*, 44 Wn. App. at 840.

In *Ferrier*, our Supreme Court considered the scope of the consent exception to the warrant requirement under article I, section 7. *Ferrier*, 136 Wn.2d 103. The court performed a *Gunwall* analysis,[2] concluding that under article I, section 7, police officers must advise citizens of their right to refuse consent to search a home when the officers use a "knock and talk" procedure. *Ferrier*, 136 Wn.2d at 118. And article I, section 7 affords greater protection than the federal constitution in other contexts. For example, the warrantless search of a car, including any containers and the trunk, incident to arrest does not violate the Fourth Amendment. *State v. Stroud*, 106 Wn.2d 144, 151, 720 P.2d 436 (1986) (citing *New York v. Belton*, 453 U.S. 454, 458, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981); *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)). But locked containers or glove compartments are outside the

---

[1] But the court did not explain its reasoning, other than to indicate that factors four and six from *State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986), supported its holding:

> In the absence of any briefing on the state constitutional issue in the instant case, . . . we note that two relevant criteria here, preexisting state law and matters of particular state interest or local concern, . . . lend support to our determination that our state constitution does not prohibit the police entry that occurred here.

*Bakke*, 44 Wn. App. at 840. The nonexclusive *Gunwall* factors are: (1) the text of the state constitutional provision, (2) significant differences between parallel state and federal constitutional provisions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between the state and federal constitutions, and (6) matters of particular state interest or local concern. *Gunwall*, 106 Wn.2d at 61-62.

[2] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

scope of a search of an automobile incident to arrest in Washington. *Stroud*, 106 Wn.2d at 152. And while "open fields" are not protected from unreasonable searches and seizures under the Fourth Amendment, *Oliver v. United States*, 466 U.S. 170, 179, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984), article 1, section 7 allows individuals to protect their private affairs in open fields if they have "manifested their desire to exclude others from their 'open fields.' " *State v. Johnson*, 75 Wn. App. 692, 707, 879 P.2d 984 (1994).

Johnson asks us to limit the scope of the emergency exception by adopting either a "strict scrutiny" approach or a "bright-line" approach to the emergency exception. Under the "strict scrutiny" approach, Johnson proposes that the emergency exception would allow entry only if the officer "strongly believes that a specific person within a residence is in actual need of assistance for serious health or safety reasons . . . [and] so long as his or her belief is objectively reasonable, well-founded, and based on specific and articulable facts." Under the "bright-line" approach, evidence obtained in an emergency entry would never be admissible.

We decline to adopt either approach. First, the emergency exception serves an important purpose: it allows police to carry out their community caretaking function to protect citizens and property. Washington courts have applied the doctrine in varied circumstances. *See, e.g., Menz*, 75 Wn. App. 351 (holding a warrantless entry valid where police responded to a domestic violence report and the front door of the home was open and lights and a television were on, but no cars were in the driveway and no one responded when the officers knocked and called out); *Gocken*, 71 Wn. App. at 277 (holding a warrantless entry valid where a person who was elderly, mentally ill, and on medication could not be contacted for several weeks). Second, to require a *strong* belief that a *specific* person is in *actual need* of help for *serious* health or safety reasons would largely defeat the purpose of the doctrine. In many cases, the officers lack the specific information that would be needed to meet this

standard. For example, the officers may not know who is the specific person in need or even the number of potential victims. The officers may not know the exact nature of the need, yet they know that something is amiss.

Because the standard Johnson proposes would frustrate the purpose of the emergency exception, we adhere to the federal test. An officer may search without a warrant when the officer subjectively believes that someone likely needs assistance for health or safety reasons, the belief is objectively reasonable, and the officer has a reasonable basis to believe that the person needing assistance is in the place searched. *Gocken*, 71 Wn. App. at 276-77. If these requirements are met and the search is not a pretext for an investigation, no greater protection against an unreasonable search is needed.

Furthermore, we have recognized two competing policies in cases where the emergency exception is invoked: (1) allowing police to help people who are injured or in danger and (2) protecting citizens against unreasonable searches. *Menz*, 75 Wn. App. at 354-55. In each case, we must balance these policies in light of the facts and circumstances. *Menz*, 75 Wn. App. at 355. If we were to adopt the standards Johnson suggests, we would lose the ability to balance these competing policies.

B. Federal Constitutional Analysis

Johnson argues that Deputy Velie had neither a subjective nor an objective belief that someone inside the house needed help. The State argues that Deputy Velie had an obligation to make sure no one else was in the house and secure any evidence of domestic violence.

This trial court found that the deputy subjectively believed that someone in the house might need help. Because Johnson does not challenge this factual finding, it is a verity on appeal. *See Hill*, 123 Wn.2d at 647. Furthermore, Deputy Velie's belief that other victims could be in the home was objectively reasonable. The dispatch call stated only that a woman had locked herself in the bathroom because

her boyfriend was beating her. When Deputy Velie arrived, Johnson was in custody. And when Deputy Velie knocked on the door, Markishtum came out and had a bloody lip. Although the officers had already found the sole suspect and sole victim, they did not know this. Deputy Velie described the home as a large split-level. And the deputy said that he entered because he did not know how many victims he had and whether any children were involved.

Courts have held that, after accounting for one victim of violence, officers may search for additional victims. In one case, an officer responding to a 911 hang-up call found a man loading things into a car "as if he were going to leave." *Lynd*, 54 Wn. App. at 19. He had a cut on his face, and he admitted committing acts of domestic violence. He said that his wife, Ms. Lynd, had gone to her mother's and was not in the house, and he declined to give the officer permission go look inside the house. Then, the officer entered the house without first trying to look inside, find Ms. Lynd, or obtain a warrant, and the officer found a marijuana grow operation inside. *Lynd*, 54 Wn. App. at 19. The court held that the officer's warrantless entry into the home was valid under the emergency exception. *Lynd*, 54 Wn. App. at 22-23.

In another case, an officer responding to a robbery report found Tamborino in his living room with blood on his head, neck, and hands. *Tamborino v. Superior Court*, 41 Cal. 3d 919, 719 P.2d 242, 243 (1986). Without knowing how many victims were involved or whether Tamborino was a suspect or a victim, the officer handcuffed him and walked through the rest of the apartment to look for other victims. The officer found cocaine residue, marijuana, and related paraphernalia. *Tamborino*, 719 P.2d at 243-44. The California Supreme Court held that, in light of the robbery report and finding one wounded and bleeding person, the officer had reasonable cause to briefly search for additional victims. *Tamborino*, 719 P.2d at 245; *see also Thompson v. McManus*, 512 F.2d 769, 770 (8th Cir. 1975) (holding that a search of a home for additional victims reasonable where a woman assaulted in her home had struggled to a neighbor's

home to call police); 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.6(a) n.24 (3d ed. 1996).

Johnson argues that Deputy Velie could have asked Markishtum whether anyone else was inside. But "victims of domestic violence are sometimes uncooperative with police because they fear retribution from their abusers." *State v. Jacobs*, 101 Wn. App. 80, 84, 2 P.3d 974 (2000); *see also State v. Grant*, 83 Wn. App. 98, 107 n.5, 920 P.2d 609 (1996). And as the *Tamborino* court held, "[a]lthough . . . another officer [may have concluded] that [the defendant] should have been questioned before even a superficial search was conducted, [this officer] could reasonably have concluded that he did not enjoy that luxury, and that immediate action was warranted." *Tamborino*, 719 P.2d at 245.

Although another officer may have questioned Markishtum before entering, we test Deputy Velie's entry by his subjective belief and whether it was objectively reasonable. "Whether a police officer's acts in the face of a perceived emergency were objectively reasonable is a matter to be evaluated in relation to the scene as it reasonably appeared to the officer at the time, 'not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis.' " *Lynd*, 54 Wn. App. at 22 (quoting *Bakke*, 44 Wn. App. at 837 (quoting *Commonwealth v. Young*, 382 Mass. 448, 416 N.E.2d 944, 950 (1981))). Deputy Velie decided to enter without questioning Markishtum about other victims. And the trial court did not find that Velie entered the home to search for drugs or contraband. An officer does not have to question the one known victim before entering to search for other victims. Deputy Velie's belief that there may have been other victims was objectively reasonable and he was justified in entering to conduct a brief walk-through search to look for other victims.

### III. Consent

Johnson also contends that his consent was invalid under

article I, section 7 because he was in custody at the time. He cites *Ferrier*, where the court held that officers must inform individuals of the right to refuse, revoke, or limit consent to a search when using a "knock and talk" procedure. *Ferrier*, 136 Wn.2d at 118. The court was concerned that people would make rash decisions to consent to searches:

> [T]he great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search.

*Ferrier*, 136 Wn.2d at 115. Johnson argues that these concerns "apply with even greater force where, as here, the person was arrested and handcuffed." The State argues that complying with the rule in *Ferrier* by informing Johnson of his right to refuse, revoke, or limit his consent was enough.

 The rule announced in *Ferrier* applies only when police officers use a "knock and talk" procedure to obtain consent to search a home. *Ferrier*, 136 Wn.2d at 118; *see also State v. Bustamante-Davila*, 138 Wn.2d 964, 980, 983 P.2d 590 (1999). In other situations, the court considers the total circumstances to determine whether consent was voluntary. *Bustamante-Davila*, 138 Wn.2d at 981. The relevant circumstances include "(1) whether *Miranda*[3] warnings had been given prior to obtaining consent; (2) the degree of education and intelligence of the consenting person; and (3) whether the consenting person had been advised of his right not to consent." *State v. Shoemaker*, 85 Wn.2d 207, 212, 533 P.2d 123 (1975). These factors are not dispositive; outside the context of a "knock and talk," whether the police told the defendant he had the right to refuse consent is simply one factor to be considered. *See State v. Werth*, 18 Wn. App. 530, 536, 571 P.2d 941 (1977). And a person may voluntarily consent to a search even

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

though he is under arrest. *Werth,* 18 Wn. App. at 535-36 (citing *United States v. Watson,* 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976)).

Sergeant Turner advised Johnson of his *Miranda* rights before requesting consent to search the house and advised Johnson that he could refuse to consent. And Johnson understood the implications of consenting to the search. Johnson asked Sergeant Turner if he needed probable cause to search the house and asked whether he could limit the scope of the search. The trial court found that, considering the total circumstances, Johnson voluntarily consented even though Sergeant Turner threatened to get a warrant if he did not consent or limit the scope of the search. This finding is supported by the record.

Johnson argues finally that his consent was invalid because the officer's threat to obtain a warrant was based on his prior illegal search of the residence, citing *State v. Apodaca,* 67 Wn. App. 736, 839 P.2d 352 (1992), *overruled on other grounds by State v. Mierz,* 127 Wn.2d 460, 901 P.2d 286 (1995). But we have held that the officers lawfully entered the home. Thus, the officer's threat to obtain a warrant was not based upon an illegal search.

We affirm.

HOUGHTON and HUNT, JJ., concur.

Review denied at 143 Wn.2d 1024 (2001).