[No. 26052-2-II.   Division Two.   October 12, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. DELAYNE SCHROEDER, *Appellant*.

---

32

*Joanne E. Dantonio* (of *Crawford, McGilliard, Peterson, Yelish & Dixon*), for appellant (appointed counsel for appeal).

*Russell D. Hauge, Prosecuting Attorney*, and *Randall A. Sutton, Deputy*, for respondent.

BRIDGEWATER, J. — Delayne Schroeder appeals her conviction of unlawful possession with intent to deliver methamphetamine. We hold that the police had authority under the "community caretaking function" to enter the house and to remain at the scene of a suicide until the coroner arrived. But they exceeded the scope of that authority when they conducted a warrantless search for the deceased's identification, after his cohabitant had identified him, beyond what they could see in plain view in the room where the deceased's remains lay. We reverse.

On November 30, 1999, at approximately 5:45 P.M., Bremerton Police Department (BPD) Officers Russell Holt and Shawn Clapp responded to Schroeder's 911 call of a shooting at her house.[1] Upon their arrival, Schroeder directed them to a bedroom where they found Donald McKeithan, whom Schroeder identified by name and as her "longtime boyfriend" and roommate. They had no reason to believe that Schroeder's identification was not reliable.

McKeithan was lying face down on the floor with a pistol clutched in his right hand. He had shot himself but was still alive and "bleeding from the mouth and eyes." Report of Proceedings (RP) at 31. Medics arrived soon after but were unable to save McKeithan's life. Schroeder told Clapp that McKeithan had previously attempted suicide and had recently seemed depressed.

Clapp asked Schroeder if McKeithan had identification; she said that he had lost his wallet somewhere in the house.

Schroeder was crying, emotionally upset, and kept trying to enter the bedroom. Clapp kept her out because it was a "pretty gruesome" scene inside. RP at 42. Clapp told her that the coroner and a crime scene detective would be arriving later to process the suicide scene. He also told her that they would be looking around for McKeithan's identification.[2] Clapp suggested she leave the scene and

---

[1] Four other BPD officers later responded to the scene.

[2] Consent is not at issue in this appeal. The State does not rely on it, nor is the record developed to demonstrate voluntariness.

Schroeder went to a friend's house accompanied by the police chaplain.

While waiting for the crime scene detective and the coroner to arrive, Clapp was responsible for securing and maintaining the integrity of the scene. This included identifying the deceased and completing a standard BPD "death scene checklist"[3] to gather information that might explain why the person committed suicide. This required looking at items at the death scene, such as delivered mail and phone messages, that might help establish time of death.

When BPD Detective Matthew Smalley (from the crime scene division) arrived, a neighbor approached and told Smalley that he believed drug activity had been going on in Schroeder's house because of the volume of foot and vehicle traffic for brief periods of time.

Smalley and Clapp proceeded to search for "primary identification" belonging to McKeithan. "Primary identification" meant a driver's license, military identification, or a Washington state identification card. Under BPD's procedures and training, verbal identification was not considered identification for purposes of processing a suicide scene. Because a driver's license has a photograph, full name and date of birth, it is "better than" other identification documents. Obtaining primary identification is very important for purposes of next of kin notification.

Clapp searched McKeithan, checking his jeans pockets, but he did not find any identification. He testified that this was not a "thorough" search.

Smalley and Clapp then searched the bedroom where McKeithan died, looking in locations where they believed a wallet might be found. They looked "on tops of dressers," "through papers . . . scattered about," RP at 89-90, and inside the closet; they did not open any drawers. Then they moved to the kitchen area.

---

[3] Checklist items included: (1) deceased's name, (2) next of kin, (3) chronology of events, (4) name of the last person who saw the deceased, (5) correspondence or mail, and (6) condition of the house. RP at 14, 84. BPD officers share the completed checklist with the coroner's office. The checklist Clapp completed was admitted as Exhibit 4 but is not part of the record on appeal.

In the hallway adjacent to the kitchen, two to four coats hung on a coat rack. Smalley reached inside the pocket of a black, synthetic leather-type jacket and found a "small zip-lock baggie," RP at 117, with three quarters of an ounce of a substance later determined to be methamphetamine. Clapp testified that the search for primary identification ceased at that point because "it became a crime scene," RP at 53, once the methamphetamine was found.

At approximately 9:45 P.M., based on the baggie of methamphetamine, BPD narcotics Detective Matthew Thuring requested a telephonic search warrant to search the residence for evidence of narcotics. The judge granted the warrant at 10:00 P.M. Execution of the warrant resulted in the discovery of one and one-half pounds of methamphetamine in 50 to 60 packages.

Meanwhile, at approximately 9:50 P.M., personnel from the coroner's office arrived on the scene. When they searched McKeithan's body, they found his wallet with picture identification in his back jeans pocket.

The trial court denied Schroeder's motion to suppress the three quarters of an ounce of methamphetamine from the coat and the one and one-half pounds of methamphetamine found using the warrant.

Schroeder contends that the trial court should have suppressed all evidence—that taken out of the coat and that acquired by means of the search warrant—which, she argues, was fruit of the poisonous tree of the material found in the coat.

## I. COMMUNITY CARETAKING FUNCTION EXCEPTION

■■■ "A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement . . . ." *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S. Ct. 7, 145 L. Ed. 2d 16 (1999) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.

Ct. 507, 19 L. Ed. 2d 576 (1967)). The legislature has condemned as unlawful searches of a dwelling without a warrant. RCW 10.79.040. Exceptions to the warrant requirement are narrowly tailored. *State v. Ladson*, 138 Wn.2d 343, 356, 979 P.2d 833 (1999). And it is the State's burden to prove that an exception applies. *Ladson*, 138 Wn.2d at 350. The Washington Supreme Court has stated: "The ultimate teaching of our case law is that the police may not abuse their authority to conduct a warrantless search or seizure under a narrow exception to the warrant requirement when the reason for the search or seizure does not fall within the scope of the reason for the exception." *Ladson*, 138 Wn.2d at 357.

At issue here is the "community caretaking function" exception the United States Supreme Court first announced in *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). *Cady* involved a vehicle accident investigation where the officers searched the car trunk after the vehicle was towed to a garage. *Cady*, 413 U.S. at 436-37. The *Cady* Court held that such a search was not unreasonable under the Fourth Amendment, stating:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute*.

*Cady*, 413 U.S. at 441 (emphasis added).

The Washington Supreme Court first cited *Cady* in *State v. Houser*, 95 Wn.2d 143, 622 P.2d 1218 (1980), an automobile impoundment case. *Houser* rejected the community caretaking exception theory under the facts there because the State failed to show the necessity, i.e., that the vehicle threatened public safety or convenience. *Houser*, 95 Wn.2d at 151-52. Subsequent Washington cases, however, have applied the community caretaking exception to search and

seizure of automobiles,[4] emergency aid situations, and routine checks on health and safety. *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000), *cert. denied*, 531 U.S. 1104 (2001).

The emergency aid exception recognizes the community caretaking function of the police to " 'assist citizens and protect property.' " *State v. Johnson*, 104 Wn. App. 409, 414, 16 P.3d 680 (2001) (quoting *State v. Menz*, 75 Wn. App. 351, 353, 880 P.2d 48 (1994)). This exception applies when

> "(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."

*Kinzy*, 141 Wn.2d at 386-87 (quoting *Menz*, 75 Wn. App. at 354).[5] Further, two competing policies come into play when the emergency aid exception is invoked: "(1) allowing police to help people who are injured or in danger, and (2) protecting citizens against unreasonable searches." *Johnson*, 104 Wn. App. at 418 (citing *Menz*, 75 Wn. App. at 354-55). We balance these policies in light of the facts and circumstances of each case. *Johnson*, 104 Wn. App. at 418.

When the State invokes this exception, the reviewing court " 'must be satisfied that the claimed emergency was not simply a pretext for conducting an evidentiary search[.]' " *Johnson*, 104 Wn. App. at 414 (quoting *State v. Lynd*, 54 Wn. App. 18, 21, 771 P.2d 770 (1989)).

Compared with the emergency aid function, routine checks on health and safety involve less urgency. *Kinzy*, 141 Wn.2d at 386. In these situations, the admissibility of

---

[4] *E.g.*, *State v. Mennegar*, 114 Wn.2d 304, 309, 787 P.2d 1347 (1990) (holding that, as part of an officer's community caretaking function, an officer may ask a passenger if the passenger desires to drive an intoxicated driver's vehicle from the scene and, thus, the encounter did not implicate Fourth Amendment interests).

[5] *E.g.*, *State v. Loewen*, 97 Wn.2d 562, 567-69, 647 P.2d 489 (1982) (holding search of tote bag for identification of car accident victim, who was being treated by hospital staff, was an invalid warrantless search where victim was beginning to regain consciousness and objectively a reasonable person would not have believed an emergency existed or continued to exist).

evidence discovered during the officer's performance of a health and safety check depends on a " 'balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform' " the community caretaking function. *Kinzy*, 141 Wn.2d at 387 (quoting *Kalmas v. Wagner*, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997)). *Kinzy* provided the following guidance when balancing these two interests:

> When the judicial scales are used to balance the governmental interest against a citizen's privacy interest in freedom from police intrusion and freedoms of association, expression and movement, "the balance ought to be struck on the side of privacy . . . ."

*Kinzy*, 141 Wn.2d at 392 (quoting *United States v. Dunbar*, 470 F. Supp. 704, 708 (D. Conn. 1979)).

## II. SEARCH OF PREMISES

Schroeder does not dispute that the officers' warrantless entry into her home was justified under the community caretaking function because they responded to her 911 call.[6] The issue is whether the search of her house, after McKeithan died, was justified. Schroeder frames the question as: "Was the search of [her] residence an unlawful warrantless search that went beyond the community caretaking function of the police department?" Br. of Appellant at 1.

The State acknowledges that this was a suicide investigation with no indication of criminal agency. The State concedes that if the police had believed this was a criminal

---

[6] It is well established that the police's warrantless entry onto the premises in response to a 911 call, or a report of someone needing assistance, is justifiable under the emergency aid exception. *E.g.*, *Johnson*, 104 Wn. App. at 412 (domestic violence report); *State v. Gibson*, 104 Wn. App. 792, 795, 17 P.3d 635 (2001) (report of babysitter smoking marijuana); *Menz*, 75 Wn. App. at 352 (domestic violence report); *State v. Leupp*, 96 Wn. App. 324, 326, 980 P.2d 765 (1999) (911 hang up call), *review denied*, 139 Wn.2d 1018 (2000); *State v. Angelos*, 86 Wn. App. 253, 254, 936 P.2d 52 (1997) (defendant's 911 call that she had overdosed on drugs), *review denied*, 133 Wn.2d 1034 (1998); *State v. Gocken*, 71 Wn. App. 267, 269, 857 P.2d 1074 (1993) (call from a concerned friend), *review denied*, 123 Wn.2d 1024 (1994); *Lynd*, 54 Wn. App. at 19 (911 hang up call).

investigation it would have been necessary to procure a search warrant under *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), because there is no "murder scene exception" to the warrant clause of the Fourth Amendment. *See Flippo*, 528 U.S. at 14.

The State argues that (1) the officers were engaged in a civil, noncriminal function of processing a suicide scene, (2) their ability to seek an accurate identification, including full name and date of birth, of a suicide victim involves important public purposes, and (3) the officers' "activity falls within the scope of those duties characterized as 'community caretaking functions[.]' " Br. of Resp't at 16-17.

The State does not expressly categorize this case as an emergency aid situation or a routine health and safety check. Whether analyzed as an emergency aid case or a routine health and safety check, the State faces significant hurdles that it does not overcome. That the search occurred inside a private residence, beyond the immediate area of the victim's body, is a fact of analytical import which the State fails to address.

The State relies on cases involving searches, in nondwelling areas, of a purse or lost property looking for a clue to its true owner, citing *State v. Kealey*, 80 Wn. App. 162, 175, 907 P.2d 319 (1995), *review denied*, 129 Wn.2d 1021 (1996), and *State v. Hutchison*, 56 Wn. App. 863, 785 P.2d 1154 (1990). *Kealey* involved a search of a purse lost in a department store. *Kealey*, 80 Wn. App. at 164. *Hutchison* was a search of the defendant who was found lying unconscious in a hotel parking lot. *Hutchison*, 56 Wn. App. at 864. Neither case involved the search of a private residence.

■ ■ The distinction between searches of a private home from searches of automobiles or public places is very important under a Fourth Amendment analysis, and even more so under Washington Constitution article I, section 7 review. As this court recently stated in *Johnson*,

[T]he home is a "highly private place" and "receives heightened constitutional protection."

. . . .

"[A]rticle I, section 7 affords greater protection from an officer's search of a home than the Fourth Amendment."

*Johnson*, 104 Wn. App. at 415 (citations omitted). *See also Houser*, 95 Wn.2d at 149 ("the expectation of privacy in regard to one's automobile is less than that relating to a home or office"). Furthermore, a person's expectation of privacy in her home is not diminished simply because she calls for medical assistance. *Thompson v. Louisiana*, 469 U.S. 17, 22, 105 S. Ct. 409, 83 L. Ed. 2d 246 (1984) (holding as unreasonable a two-hour general warrantless search of the defendant's house following police entry in response to defendant's call for help). As the Supreme Court stated in *Thompson*:

> Petitioner's attempt to get medical assistance does not evidence a diminished expectation of privacy on her part. To be sure, this action would have justified the authorities in seizing evidence under the plain-view doctrine while they were in petitioner's house to offer her assistance. In addition, the same doctrine may justify seizure of evidence obtained in the limited "victim-or-suspect" search discussed in *Mincey*.[7]

469 U.S. at 22.

Here, to support its contention that the search of Schroeder's home was justified, the State relies on the fact of police training and assisting the coroner, although not as agents of the coroner or as deputy coroners. It argues that the BPD officers were performing a community caretaking function by processing the suicide scene—more specifically, searching for primary identification of the deceased—because: (1) the BPD officers provide needed assistance to the coroner's office which is scarce in resources, and (2) the collection of accurate identification furthers the public interest underlying RCW 68.50.300. This statute provides:

[7] *Mincey v. Arizona*, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (police may make warrantless entries on premises where "they reasonably believe that a person within is in need of immediate aid," *id.* at 392, and that "they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises") (cited in *Thompson*, 469 U.S. at 21).

**Release of information concerning a death.**

(1) The county coroner, medical examiner, or prosecuting attorney having jurisdiction may in such official's discretion release information concerning a person's death to the media and general public, in order to aid in identifying the deceased, when the identity of the deceased is unknown to the official and when he does not know the information to be readily available through other sources.

(2) The county coroner, medical examiner, or prosecuting attorney may withhold any information which directly or indirectly identifies a decedent until either;

(a) A notification period of forty-eight hours has elapsed after identification of the decedent by such official; or

(b) The next of kin of the decedent has been notified.

During the forty-eight hour notification period, such official shall make a good faith attempt to locate and notify the next of kin of the decedent.

RCW 68.50.300.

The State argues that obtaining identification allows the coroner to notify the deceased's next of kin before the information about the suicide is released to the media. The State further argues that proper identification during the 48-hour period serves the legislative intent of preventing the victim's next of kin from learning about the suicide from the media and, thus, the public interest in accurate, speedy identification of the suicide victim outweighs the individual's freedom from a search of personal papers and effects in one's home.

The State urges this court to reach the same conclusion the trial court did, i.e., the officers acted reasonably and in good faith when they searched the house for McKeithan's primary identification, performing their community caretaking function of helping the coroner's office process the suicide scene.[8] In relying on RCW 68.50.300, the State

---

[8] Our review is limited to the BPD officers' conduct. We do not address, nor does the State argue, the authority of the coroner's office in executing its responsibilities under chapter 68.50 RCW (Human Remains) or its ability to seek an administrative search warrant.

ignores other authorized means of identification under RCW 68.50.330. This provision specifically recognizes establishing identity by (1) visual means, (2) fingerprints, (3) or other identifying data, and (4), if these fail, then by a dental examination. RCW 68.50.330. Thus, identifying the deceased plainly is the coroner's duty, which he can accomplish by many methods. The State also ignores the plain method at their disposal of ordering a license from the Department of Licensing (DOL) based on the information given by the deceased's cohabitant, Schroeder. The question becomes: "Was the search for identification so compelling that it overshadowed the privacy of the homeowner?" We answer no.

## III. SCOPE

▬▬▬ When police enter to render aid to a person believed to be in need of medical assistance, they may examine the body. 3 WAYNE R. LAFAVE, SEARCH & SEIZURE § 6.5(e), at 386 (3d ed. 1996). Further, "the police need not close their eyes to objects of evidentiary value which are in the immediate vicinity of the body." LAFAVE, *supra*, at 386-87 (footnote omitted).

The *Kinzy* court said:

> Once the [community caretaking function] exception does apply, police may conduct a noncriminal investigation so long as it is necessary and strictly relevant to performance of the community caretaking function. The noncriminal investigation must end when reasons for initiating an encounter have been fully dispelled.

*Kinzy*, 141 Wn.2d at 395. *Kinzy* applied the exception to the police's encounter with a juvenile on a public street in a high narcotics trafficking area and accompanied by older males known to be narcotics users. The *Kinzy* court held that the officers' initial questioning of the youth to determine if she needed help was justified, but grabbing the juvenile when she tried to walk away constituted an unlawful seizure. *Kinzy*, 141 Wn.2d at 395-96.

Two key facts distinguish this case from cases that have upheld a warrantless search under the community caretaking exception. One, the zip-lock baggy seized from inside a coat pocket was not in plain view. Two, the emergency or exigency (McKeithan's need for medical attention) had ended.

We recently decided two cases under the emergency aid exception: *State v. Johnson*, 104 Wn. App. 409, 16 P.3d 680 (2001), and *State v. Gibson*, 104 Wn. App. 792, 17 P.3d 635 (2001). In *Johnson*, the police responded to a domestic violence report. Once inside the house, the police immediately smelled marijuana; the domestic violence victim told the officer she and the defendant had been smoking marijuana. *Johnson*, 104 Wn. App. at 412. The victim then showed the officers marijuana paraphernalia, and they noticed a green substance that looked like marijuana in a coffee grinder. *Johnson*, 104 Wn. App. at 413. *Johnson* held that the entry was justified under the emergency exception, and that the officers acted reasonably by "conduct[ing] a brief walk-through search to look for other victims." *Johnson*, 104 Wn. App. at 420.

In *Gibson*, the police responded to a report that a babysitter was smoking marijuana. *Gibson*, 104 Wn. App. at 795. When the officers first entered the defendant's (babysitter's) house, she led them to a bedroom and showed them some marijuana. *Gibson*, 104 Wn. App. at 798. Then, after the children were secured, the defendant disappeared from the officers' sight for three to five minutes. Becoming concerned, the officers searched and found her in a bedroom emptying marijuana from bags into a pile. *Gibson*, 104 Wn. App. at 796. The trial court concluded that the exigency ended when the officers found the first batch of marijuana and secured the children and, thus, no exigent circumstances justified following her down the hallway and into the bedroom. *Gibson*, 104 Wn. App. at 796. We disagreed and held that the second limited search was justified

because "the exigent circumstances had not ended." *Gibson*, 104 Wn. App. at 799.

In this case, several reasons compel our holding. First, the exigency that justified the BPD officers' entry into Schroeder's house ended when McKeithan died.[9] Second, the community caretaking function of waiting at the scene of the suicide for the coroner, while the cohabitant of the premises was grief-stricken and absent, did not include searching the premises or performing the coroner's job. Third, a less intrusive method, other than searching the premises, to establish identification of the deceased was available through the DOL. Fourth, the search here was not a plain view search and was more intrusive than *Johnson* and *Gibson*; it went beyond the person of the deceased into other rooms and areas not in plain view, i.e., inside coat pockets. Finally, it is unlikely that a warrant would have been granted to search the premises for a misplaced driver's license of the deceased where there were other methods of obtaining identification, e.g., fingerprints, DOL, personal identification to corroborate the cohabitant.

We hold that the search of the coat in the hallway was unlawful. It exceeded any scope deemed permissible or reasonable under the community caretaking function.[10] The evidence should have been suppressed.

---

[9] *See Loewen*, 97 Wn.2d at 568-69 (holding emergency aid exception did not justify officer's search of car accident victim's tote bag at the hospital where victim was being treated by medical personnel and beginning to regain consciousness, contraband found inside bag should have been suppressed). *Cf. State v. Angelos*, 86 Wn. App. 253, 255, 936 P.2d 52 (1997) (police responded to defendant's 911 call that she had overdosed on drugs; holding that, where there were children in the house, the officers' search for drugs in the bathroom was proper), *review denied*, 133 Wn.2d 1034 (1998).

[10] By our decision we do not hold that it would never be reasonable to look into a coat pocket in the vicinity of a recently deceased person. In this case it was unreasonable given that the cohabitant had already identified the deceased and police had no reason to believe Schroeder's identification was unreliable.

Reversed and remanded for dismissal with prejudice.[11]

HUNT, A.C.J., and SEINFELD, J., concur.

---

[11] The State acknowledged in its brief that, without the methamphetamine found in the coat, there would not have been probable cause for the search warrant. Br. of Resp't at 20. As fruits of an unlawful search, the one and one-half pounds of methamphetamine and other items seized by execution of the warrant should have been suppressed as well. Given that the stipulated facts trial relied on illegally seized evidence, dismissal with prejudice is appropriate on remand.