FILED
COURT OF APPEALS
DIVISION II

2013 DEC 31  AM 9: 17

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43567-5- II |
| Respondent, | |
| v. | |
| NATHAN JOE DELGADO, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. —Nathan Joe Delgado appeals his stipulated bench trial convictions for felony driving under the influence and driving with a suspended or revoked license. He argues that the trial court erred in denying his motion to suppress evidence, in particular his blood alcohol test results, for lack of reasonable, articulable suspicion to justify "stopping" his vehicle and "seizing" him without a warrant.[1]  Holding that the encounter was reasonable under the community caretaking exception to the constitutional warrant requirement, we affirm.

---

[1] Br. of Appellant at 11.

## FACTS

### I. BACKGROUND

#### A. Border Patrol Stop

Nathan Joe Delgado was driving a pickup truck on Railroad Drive in downtown Port Angeles, along the waterfront, near the marina that provides ferry transportation across the United States border to Canada. Railroad Drive is "as close to the border as you can get without actually being in the water." Verbatim Report of Proceedings (VRP) (May 30, 2012) at 8. U.S. Border Patrol Agent Jose Romero observed binoculars on Delgado's pickup's dashboard and watched Delgado make abrupt stops in the middle of the empty roadway and then accelerate quickly and suddenly stop again. In his experience along the southern U.S. border, Romero had observed similar behavior when smugglers were scouting an area or looking to pick up humans or contraband. Romero continued to follow as Delgado continued to start and to stop abruptly in the middle of the road and then make a series of left turns. Now suspicious, Romero ran a license plate check for Delgado's pickup truck and learned that its tags were invalid. As Romero pulled closer, Delgado made a sudden, illegal left turn followed by another left turn. Unable to make the same turn safely, Romero proceeded down the street, turned around, and refueled at a gas station. At this point, Romero lost sight of Delgado.

At the same gas station, Delgado pulled up to the adjacent pump, shut off the truck's engine, and slumped in his seat. Romero approached and initially asked Delgado "if he was

okay"[2]; it appeared that Delgado was impaired for some reason unknown to Romero[3], who then asked for his name, where he was from, and what he was doing in the area. According to Romero, Delgado's responses were "[s]omewhat incoherent": Romero "couldn't really make out anything [Delgado] was saying"; it appeared that Delgado "was being evasive"; and Delgado "didn't want to provide . . . a name or tell . . . where he was from." VRP (May 30, 2012) at 14. When Romero asked for identification, Delgado

> wouldn't produce any type of identification initially. . . . [A]ll he could provide to me was a vehicle insurance card, and as he handed that to me he stated that that was his driver's license. . . . I explained to him that this was his insurance card and not his driver's license, and he looked at me bewildered and said, well, doesn't that work? I said that doesn't identify who you are. I would like something that would tell me who it is that you are and so forth.

VRP (May 30, 2012) at 15. Delgado then "slumped over to the side of the vehicle and just [lay] there. . . . He couldn't move"; after a few minutes, Delgado produced a Washington State identification card, but no driver's license. VRP (May 30, 2012) at 15. Romero believed that Delgado's "incoherence . . . stemm[ed] from either a health condition, [or] some type of either narcotic or alcohol use." VRP (May 30, 2012) at 16.

Delgado's vague responses and initial failure to produce identification gave Romero the impression that Delgado was "trying to conceal his identity," which caused Romero to wonder whether Delgado might be involved in "some type of criminal activity" that Romero "need[ed] to

---

[2] VRP (May 30, 2012) at 13.

[3] Romero "couldn't tell what was wrong": He had no training in DUI enforcement, although he had some experience dealing with "some of the effects and incoherencies that come across from narcotic use." VRP (May 30, 2012) at 17. Romero "didn't actually smell any alcohol, but [he] couldn't tell what was wrong[. He] just couldn't tell what it was." VRP (May 30, 2012) at 17.

be concerned about[.]" VRP (May 30, 2012) at 16. Romero told Delgado he was "going to call into radio dispatch" and asked for his vehicle keys, which Romero placed on Delgado's pickup truck roof. VRP (May 30, 2012) at 16. Romero took Delgado's identification card back to his patrol car, ran a check for "officer safety issues," VRP (May 30, 2012) at 17, and learned that Delgado had "an extensive criminal history," including "assault and various felonies," "extraditable warrants out of Illinois and Colorado,"[4] "warrants out of Seattle,"[5] and "a prior flight from law enforcement." VRP (May 30, 2012) at 17. Romero detained him for a few minutes until Port Angeles Police Department Officer Dallas Maynard arrived to take Delgado into custody on the outstanding warrants. After handing off Delgado, Romero left.

### B. Arrest for Driving Under the Influence

Based on Delgado's strong odor of alcohol, Maynard arrested him on suspicion of driving under the influence (DUI) and driving with a suspended or revoked license.[6] When Delgado refused to take a breathalyzer test, and after advising him of his *Miranda*[7] rights, Maynard drove

---

[4] Clerk's Papers (CP) at 62. Romero also verified that Delgado was a U.S. citizen.

[5] CP at 62.

[6] During the telephonic request for a search warrant to draw Delgado's blood for a blood alcohol test, Maynard stated under oath that, as he spoke with Delgado at the gas station, he "detected a fairly strong odor of intoxicating liquor. Mr. Delgado's speech was pretty low, somewhat slurred, his eyes were red and glassy." CP at 52. When Maynard later asked Delgado if he had anything to drink, Delgado "said that he had a drink." CP at 53. Maynard asked Delgado to step out of the truck, patted him down, and removed a folding knife from the front of Delgado's pants. Maynard asked if Delgado would take a field sobriety test, but he declined and requested a lawyer. Maynard offered to give Delgado a breathalyzer test, which he also declined. Maynard then placed Delgado "under arrest for DUI-Alcohol. As he was standing there talking to me . . . he was also swaying back and forth . . . and side to side." CP at 53.

[7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Delgado to the hospital and requested a telephonic search warrant for two vials of his blood. The court granted the warrant, and a technician drew Delgado's blood for a blood alcohol test. A later analysis revealed that Delgado's blood alcohol content was .21 per 100 ml of blood.

## II. PROCEDURE

The State charged Delgado with DUI and driving while his license was revoked or suspended. Because Delgado had been denied counsel at the police station, the trial court granted his motion to suppress his refusal to take a breathalyzer test.[8] Delgado also filed a separate CrR 3.6 motion to suppress all evidence obtained after his interaction with Romero, arguing that the stop had been illegal and, thus, all evidence gathered as a result was the "fruit of the poisonous tree."[9] The trial court denied this CrR 3.6 motion, ruling that, based on Delgado's actions and apparently impaired condition, (1) Romero had reason to suspect that Delgado was suffering from some sort of medical or other impairing condition and (2) Romero had acted reasonably in temporarily taking Delgado's keys and his identification to run a background check. Delgado did not object below that the trial court's findings of fact and conclusions of law on his suppression motions were inadequate.

Delgado waived his right to jury trial and stipulated to the facts. The trial court found him guilty of DUI and driving while his license was suspended. Delgado appeals.

---

[8] Denial of counsel is not at issue in this appeal. The State does not cross-appeal suppression of Delgado's refusal to take the breathalyzer test.

[9] CP at 153, 157. Delgado did not, however, contest the validity of the telephonic search warrant to draw his blood; and he stipulated to the results of his blood alcohol test.

ANALYSIS

Delgado assigns error to the trial court's (1) finding of fact 1 and conclusion of law 1—that Romero had a reasonable, articulable, non-pretextual basis for "stop[ping]" him (Delgado) and checking his identification; and (2) denial of his motion to suppress all evidence seized after this stop. Br. of Appellant at 1. Delgado argues that Romero lacked a reasonable articulable suspicion to stop him and, therefore, violated federal and state constitutional prohibitions on warrantless search and seizure when he took Delgado's keys and identification. Delgado also argues that, if Romero had complied with constitutional requirements, he (Romero) would not have seized Delgado's identification and, consequently, local law enforcement would not have collected any evidence to charge him with DUI. Based on this reasoning, Delgado contends that the trial court should have suppressed the evidence of the blood alcohol test results as a "fruit of the poisonous tree" because it was procured as a result of Romero's initial allegedly unlawful seizure. Br. of Appellant at 20 (citing *State v. Ladson*, 138 Wn.2d 343, 359-60, 979 P.2d 833 (1999), *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986) and *State v. Carney*, 142 Wn. App. 197, 204-05, 174 P.3d 142 (2007)). These arguments fail.

I. STANDARDS OF REVIEW

When reviewing a trial court's denial of a suppression motion, we review the trial court's findings of fact to determine whether substantial evidence supports them and whether those findings support the trial court's conclusions of law. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009) (citing *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)). Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding. *Hill*, 123 Wn.2d at 644 (citing *State v.*

*Halstien*, 122 Wn.2d 109, 129, 857 P.2d 270 (1993)). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)), *abrogated in part on other grounds, Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Unchallenged findings of fact are verities on appeal. *Hill*, 123 Wn.2d at 644 (citing *In re Riley*, 76 Wn.2d 32, 33, 454 P.2d 820, *cert. denied*, 396 U.S. 972 (1969) and *Tomlinson v. Clarke*, 118 Wn.2d 498, 501, 825 P.2d 706 (1992)). We review the trial court's conclusions of law de novo. *Garvin*, 166 Wn.2d at 249 (citing *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002) and *State v. Carneh*, 153 Wn.2d 274, 281, 103 P.3d 743 (2004)).

Both the Fourth Amendment to the federal constitution and article I, section 7 of Washington's Constitution prohibit warrantless searches and seizures unless one of the narrow exceptions to the warrant requirement applies.[10] *Garvin*, 166 Wn.2d at 249. The State bears the burden of demonstrating that a warrantless search or seizure falls within an exception to the warrant requirement. *State v. Hendrickson*, 129 Wn.2d 61, 71, 917 P.2d 563 (1996) (citing *State v. Johnson*, 128 Wn.2d 431, 447, 909 P.2d 293 (1996)), *overruled on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed.2d 482 (2006). Seizures are constitutional if they are "reasonable" under the Fourth Amendment of the federal constitution and if they are

---

[10] Article I, section 7 to the Washington Constitution provides more extensive privacy protections than the Fourth Amendment to the federal constitution and creates "'an almost absolute bar to warrantless arrests, searches, and seizures, with only limited exceptions.'" *State v. Buelna Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009) (quoting *State v. Ringer*, 100 Wn.2d 686, 690, 674 P.2d 1240 (1983), *overruled in part by State v. Stroud*, 106 Wn.2d 144, 150-51, 720 P.2d 436 (1986)).

undertaken with "'authority of law'" under article I, section 7 of Washington's constitution. *State v. Bonds*, 174 Wn. App. 553, 564, 299 P.3d 663 (citing *State v. Williams*, 171 Wn.2d 474, 484-85, 251 P.3d 877 (2011)), *review denied*, 178 Wn.2d 1011 (2013).

A traffic stop is a "'seizure.'" *Ladson*, 138 Wn.2d at 350 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)); (citing *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) and *City of Seattle v. Mesiani*, 110 Wn.2d 454, 460, 755 P.2d 775 (1988) (Dolliver, J., concurring)). Both the federal and state constitutions permit a warrantless investigative detention—to which traffic stops are analogous[11]—whenever a law enforcement officer has a reasonable suspicion, based on "'specific and articulable facts'" and "'rational inferences from those facts,'" that the stopped person has been or is about to be involved in a crime. *State v. Snapp*, 174 Wn.2d 177, 197, 275 P.3d 289 (2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)); *see State v. Doughty*, 170 Wn.2d 57, 62, 239 P.3d 573 (2010); *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). In evaluating the reasonableness of an investigative detention, we consider "the totality of the circumstances, including the officer's training and experience, the location of the stop, and the conduct of the person detained." *Acrey*, 148 Wn.2d at 747 (citing *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991)).

---

[11] *See Ladson*, 138 Wn.2d at 350.

No. 43567-5-II

When a federal agent collects evidence under federal law in Washington state, Washington law governs admissibility of such evidence if used in a state court prosecution.[12] *State v. Williams*, 94 Wn.2d 531, 540 n.1, 617 P.2d 1012 (1980). Because Delgado had an expectation of state law protections in his state prosecution, the evidence used here against him for violation of a state law was subject to the stricter search and seizure protections of Washington law, even if the State procured that evidence as a result of federal agent Romero's initial encounter with Delgado.

## II. LAWFULLY SEIZED EVIDENCE

Delgado first argues that the trial court should have suppressed the blood alcohol test results collected by local law enforcement following his earlier interaction with Romero because Romero lacked reasonable articulable suspicion to "stop" and seize him (Delgado) and Romero's "stop" was pretextual. Br. of Appellant at 11. The State responds that Romero did not "stop"[13] Delgado at all: Rather, (1) Romero was refueling at a gas station when Delgado drove into the

---

[12] The trial court did not explain whether it was applying federal or state law when it ruled on the admissibility of evidence used in Delgado's state court prosecution. The State contends, however, that, because Romero was acting in his official capacity as a federal border patrol agent, we should apply federal law to determine whether a warrant was necessary. *See State v. Bradley*, 105 Wn.2d 898, 902-03, 719 P.2d 546 (1986) ("[n]either state law nor the state constitution can control federal officers' conduct."). Delgado cites Washington law in support of his arguments.

We agree with Delgado that state law applies. "[F]ederal law supersedes state statutes 'only to the extent necessary to protect the achievement of the aims of the [federal enactment].'" *State v. Williams*, 94 Wn.2d 531, 540, 617 P.2d 1012 (1980) (second alteration in original) (internal quotation marks omitted) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127, 94 S. Ct. 383, 38 L. Ed. 2d 348 (1973)). Application of federal or state law, however, is not a key issue in this appeal.

[13] Br. of Resp't at 24.

same gas station and stopped his truck on his own, with no prompting whatsoever by Romero, and slumped down in his seat; and (2) Romero's temporarily taking Delgado's identification and car keys did not "stop[] Delgado from going about his business" for which he had originally pulled up to the adjacent gas pump. Br. of Resp't at 25. The State further responds that, based on Romero's earlier observations of Delgado's erratic driving and current observations of Delgado at the gas station, he (Romero) had reasonable basis for "seizing" Delgado based on his "lack of responsiveness to Agent Romero's questions, his evasiveness, and that he appeared to be ill or intoxicated" and, "therefore[,] a risk to the public if he [(Delgado)] continued to drive." Br. of Resp't at 25, 35. We hold that Romero's detention of Delgado was not pretextual but rather was reasonable under the community caretaking exception to the warrant requirement.

### A. Initial Encounter

"Not every encounter between a citizen and a police officer rises to the stature of a seizure. By simply engaging a person in conversation, an officer does not thereby 'seize' that person." *State v. Mennegar*, 114 Wn.2d 304, 310, 787 P.2d 1347 (1990) (citing *State v. Belanger*, 36 Wn. App. 818, 677 P.2d 781 (1984), *Florida v. Rodriquez*, 469 U.S. 1, 105 S. Ct. 308, 83 L. Ed. 2d 165 (1984) and *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)), *overruled on other grounds by State v. Hill*, 123 Wn.2d 641, 645, 870 P.2d 313 (1994). "Nor is there a seizure where the conversation between citizen and officer is freely and voluntarily conducted." *Mennegar*, 114 Wn.2d at 310 (citing *Belanger*, 36 Wn. App. at 821).

Here, Romero saw Delgado slumped in his stopped pickup truck at a public gas station; Delgado "didn't look very healthy" and looked "extremely tired and sleepy." VRP (May 30,

2012) at 35. Romero initially approached and asked Delgado's name, where he was from, and "if he was okay." VRP (May 30, 2012) at 13. Delgado variably did not respond, responded that he did not know, or responded with a question.

This encounter did not involve a vehicle stop, any show of force by the officer, or an unreasonable intrusion into Delgado's privacy. Rather, it was initially the type of permissible encounter our Supreme Court described in *Mennegar*, where an officer "simply engage[ed] a person in conversation." *Mennegar*, 114 Wn.2d at 310. Consequently, Romero's approaching Delgado's already stopped pickup and asking him basic identifying questions was not a seizure and, thus, it did not implicate the state or federal constitution.

B. Initial Warrantless Seizure: Community Caretaking Exception

But when Romero took Delgado's identification and car keys, this encounter transformed into a warrantless seizure (despite, as the State notes, that Romero did not prevent Delgado from filling up his truck with gas or following through with whatever business he had at the gas station). *See State v. Thomas*, 91 Wn. App. 195, 200-01, 955 P.2d 420, *review denied*, 136 Wn.2d 1030 (1998) ("Once an officer retains the suspect's identification or driver's license and takes it with him to conduct a warrants check," the officer effects "a seizure within the meaning of the Fourth Amendment.") (citing *State v. Dudas*, 52 Wn. App. 832, 834, 764 P.2d 1012 (1988), *review denied*, 112 Wn.2d 1011 (1989) and *State v. Aranguren*, 42 Wn. App. 452, 456-57, 711 P.2d 1096 (1985)).

> While merely requesting identification, without more, does not constitute a seizure; a seizure may occur when the circumstances surrounding the encounter demonstrate that a reasonable person would believe he or she was not free to leave. Whether a reasonable person would believe he or she has been detained depends upon the objective facts surrounding the encounter.

*Mennegar*, 114 Wn.2d at 310-11 (footnotes and citations omitted). Here, the objective facts show that Romero seized Delgado's keys so Delgado could not drive his truck and that Romero seized Delgado's identification when he took it back to his patrol vehicle to run a records check. *See Thomas*, 91 Wn. App. at 200-01 (citing *Dudas*, 52 Wn. App. at 834 and *Aranguren*, 42 Wn. App. at 456-57). In order to be considered lawful, this warrantless seizure had to fall under one of the exceptions to the warrant requirement.

The State relies on the "community caretaking exception to the warrant requirement" in *State v. O'Neill*, 148 Wn.2d 564, 574, 62 P.3d 489 (2003) to support its contention that Romero acted reasonably in taking Delgado's truck keys based on his (1) "reasonable suspicion that Mr. Delgado was either ill or affected by drugs or alcohol and therefore a risk to the public if he continued to drive"[14]; and (2) belief that Delgado's "incoherence . . . stemm[ed] from either a health condition, [or] some type of either narcotic or alcohol use."[15] VRP (May 30, 2012) at 16. In another community caretaking case, decided soon after *O'Neill*, our Supreme Court elaborated:

> When police officers are engaged in noncriminal, noninvestigative "community caretaking functions," "whether a particular stop is *reasonable* depends not on the presence of 'probable cause' or 'reasonable suspicion,' but rather on a balancing of the competing interests involved in light of all the surrounding facts and circumstances." [T]he "community caretaking function"

---

[14] Br. of Resp't at 35.

[15] Based on his impression that Delgado was "trying to conceal his identity" by responding vaguely and failing to produce identification upon request, Romero also suspected that Delgado might be involved in "some type of criminal activity." VRP (May 30, 2012) at 16. Thus, Romero took Delgado's identification to run a records check for "officer safety." VRP (May 30, 2012) at 17.

12

exception to the warrant requirement encompasses "not only the 'search and seizure' of automobiles, but also situations involving either emergency aid or routine checks on health and safety."

*Acrey*, 148 Wn.2d at 748-49 (footnotes and citations omitted) (quoting *State v. Chisholm*, 39 Wn. App. 864, 867, 696 P.2d 41 (1985) and *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000) and citing *Mennegar*, 114 Wn.2d at 313).

Police officers are obligated and expected to help people and to protect property. *State v. Gibson*, 104 Wn. App. 792, 796, 17 P.3d 635 (2001) (citing *State v. Menz*, 75 Wn. App. 351, 353, 880 P.2d 48 (1994) and *State v. Davis*, 86 Wn. App. 414, 420, 937 P.2d 1110 (1997)). Accordingly, the "health and safety" or "emergency exception," which recognizes a police officer's community caretaking responsibilities, is one exception to the general warrant requirement. *State v. Schlieker*, 115 Wn. App. 264, 270-71, 62 P.3d 520 (2003). Whether a seizure falls within the community caretaking exception is a question of law, which we review de novo. *Schlieker*, 115 Wn. App. at 269 (citing *State v. Mendez*, 137 Wn.2d 208, 212, 970 P.2d 722 (1999), *overruled on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)). To invoke this exception, the State must show that (1) the officer subjectively and reasonably believed someone needed health or safety assistance; (2) the search was not primarily motivated by intent to arrest and to seize evidence; and (3) "there was a reasonable basis to associate the need for assistance with the place searched." *Schlieker*, 115 Wn. App. at 270; *State v. Nichols*, 20 Wn. App. 462, 465-66, 581 P.2d 1371 (1978). The State has met this burden here.

Delgado argues that Romero unreasonably seized his keys and identification and that his stated concern for public safety was merely an excuse to "pursu[e] a hunch about potential

criminal activity." Br. of Appellant at 15. The trial court, however, drew a different conclusion based on Romero's report of Delgado's (1) earlier illegal, erratic or evasive driving,[16] followed by his pulling into a gas station and slumping over in his seat, demonstrating a potential hazard on the road; and (2) incoherent responses to Romero's questions, creating a reasonable suspicion that something was wrong.[17] See *State v. Bencivenga*, 137 Wn.2d 703, 709, 974 P.2d 832 (1999) (trial court may "logically infer[] intent from proven facts, so long as it is satisfied the state has proved that intent beyond a reasonable doubt"). This substantial evidence supported the trial

---

[16] Romero had witnessed Delgado make an illegal left turn under a red light, in violation of Washington law. RCW 46.61.055, .290. Delgado's license plate tags were also invalid. Although Romero had reasonable suspicion that Delgado had violated, or was about to violate, federal laws related to border protection or to stop him for traffic violations, Romero chose not to continue following Delgado because, according to Romero, once Delgado "left the . . . area of immediate concern for me, which is the border area," then he would conclude "that there's nothing going on having to do with the border at this point." VRP (May 30, 2012) at 10.

Romero's later chance encounter with Delgado occurred when Delgado pulled into the gas station pump next to where Romero was fueling his vehicle. At this point, according to Romero, whom the trial court implicitly found credible, Romero's focus changed to a community caretaking focus when he saw Delgado slumped in the car, approached the vehicle, began asking questions to determine Delgado's identity and whether he needed assistance, and observed that Delgado was incoherent and appeared impaired.

[17] Romero's articulated concerns about Delgado's evasiveness did not transform this encounter into a pretextual stop:

> I'm thinking he's trying to conceal his identity from me. So at that point my thought process is more along the lines of is there some kind of criminal history that I'm needing to be concerned about? Is there a reason why he doesn't produce some type of identification for me to be able to identify who he is, because perhaps there may be some type of criminal activity that I need to be aware of.

VRP (May 30, 2012) at 16. Romero had reason to be concerned for his own safety, as well as the driving public's safety. In Washington, concern for officer safety is a legitimate exception that permits the officer to conduct a warrantless search, *State v. Glenn*, 140 Wn. App. 627, 633-34, 166 P.3d 1235 (2007) (citing *State v. Bradley*, 105 Wn. App. 30, 36, 18 P.3d 602, 27 P.3d 613 (2001) and *State v. Larson*, 88 Wn. App. 849, 853, 946 P.2d 1212 (1997)), and to restrict the suspect's freedom of movement. *State v. Wakeley*, 29 Wn. App. 238, 243 n.1, 628 P.2d 835 (1981).

court's ruling that Romero had reason to believe that Delgado was impaired, by medical issues, alcohol, or some other condition unknown to Romero; this impairment justified Romero's taking Delgado's keys and identification and checking further before allowing Delgado to drive away.[18] *See Nichols*, 20 Wn. App. at 465-66. We hold, therefore, that Romero was acting within the community caretaking exception to the warrant requirement when he took Delgado's keys and identification.

The trial court also concluded that, under these circumstances, a reasonable person would expect police to investigate further to see whether the driver needed medical help and to ensure that the driver was not impaired so as to endanger others by continuing to drive. "In determining whether an officer's encounter with a person is reasonable as part of a routine check on safety," we balance the "'individual's interest in freedom from police interference against the public's interest in having the police officers perform a community caretaking function.'" *Acrey*, 148 Wn.2d at 750 (quoting *Kinzy*, 141 Wn.2d at 387). Here, Romero's initial intrusion into

---

[18] More specifically, the trial court remarked first about Romero's "reasonable suspicion" to follow Delgado after observing his erratic driving and suspicious activity along the waterfront to find out what he was "up to." VRP (May 30, 2012) at 67, 68. But after Romero lost sight of Delgado when he left the downtown area, Romero's "following" him was "done." VRP (May 30, 2012) at 68. But when Romero later witnessed Delgado drive into the gas station, Romero observed,

> [S]omething is not right. He's not acting normally. He is slumped over in the seat of his car. I think any good law enforcement officer at this point regardless of what his mission is would go over and do what Officer Romero did and say, are you okay, sir? Is something wrong? He's observed this erratic driving, possibly evasive behavior, now he's looking at somebody who does not appear to be well. As it turns out the evidence would suggest he was extremely intoxicated, but Agent Romero certainly doesn't know that.

VRP (May 30, 2012) at 68.

Delgado's privacy was limited: Delgado remained in his truck with the keys on the roof while Romero checked on his license status; and Romero did nothing to prevent Delgado from filling his truck with fuel or transacting whatever business he had for pulling into the gas station in the first place.

### C. Probable Cause To Detain on Arrest Warrants

Once Romero discovered Delgado's outstanding arrest warrants and decided to transfer him into the custody of local police, the encounter was no longer part of the community caretaking function: Instead, the arrest warrants provided probable cause for Romero to detain Delgado. Our Supreme Court has held that "[o]nce [an] officer discover[s] the existence of an outstanding arrest warrant, the officer [is] clearly and properly performing his duty by arresting" the individual. *Mennegar*, 114 Wn.2d at 314. Here, although Romero himself did not formally arrest Delgado on the warrants, we hold that he acted reasonably in detaining Delgado until he could transfer custody to local law enforcement officers, who did arrest him. *Id.*

Accordingly, we affirm the superior court's denial of Delgado's motion to suppress the challenged evidence.

### III. ADEQUACY OF TRIAL COURT'S FINDINGS OF FACT ON LEGALITY OF SEIZURE

Lastly, Delgado argues that the trial court's oral and written findings of fact and conclusions of law for the CrR 3.6 suppression hearing were inadequate and that this inadequacy prejudiced him. Delgado did not object below to the adequacy of the trial court's findings; nor did he propose more specific language for the trial court to include. Thus, he has not preserved this issue for appeal. RAP 2.5(a). On appeal, Delgado fails to assign specific error to the inadequacy of these findings and to state the issue pertaining to such error, contrary to RAP

10.3(a)(4).[19]   Accordingly, we do not further consider this argument.[20]   *See* RAP 2.5(a); RAP 10.3(a)(4) and (g).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Worswick, C.J.

Johanson, J.

---

[19] Although Delgado later argues in the body of his brief on appeal that these allegedly inadequate findings prejudiced him, we do not find his analysis persuasive.

[20] We note that inadequate or missing findings of fact and conclusions of law do not warrant reversal where the record as a whole, including the trial court's oral rulings, are sufficient to allow appellate review, which is the case here.  *See State v. Mitchell*, 169 Wn.2d 437, 447 n.6, 237 P.3d 282 (2010) (citing *State v. Bynum*, 76 Wn. App. 262, 266, 884 P.2d 10 (1994) and *State v. Clark*, 46 Wn. App. 856, 859, 732 P.2d 1029 (1987)).