IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31185-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| KELLY EUGENE SMALL, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Kelly Small appeals his convictions for first degree rape, first degree burglary, and forgery. He contends the trial court erred when it admitted forensic evidence of an indented writing,[1] imposed a 24-month sexual motivation enhancement, and instructed the jury that it had a "duty" to find him guilty if the State proved the crimes charged beyond a reasonable doubt. He raises four more alleged errors in a pro se statement of additional grounds.

We remand for partial resentencing in light of the possibly mistaken application of the enhancement, which was not mandatory at the time of Mr. Small's crimes. We otherwise affirm.

---

[1] An indented writing is the impression left on a piece of paper that is beneath another piece of paper being written on. *Bramlett v. True*, 59 F. App'x 1, 5 (4th Cir. 2003).

FACTS AND PROCEDURAL BACKGROUND

In April 2009, Detective Jeff Koplin of the Omak Police Department was assigned to an unsolved rape case. Seventy-five-year-old Barbra Murphy[2] had been violently sexually assaulted in her home a little after midnight one morning in early 2006 by a man who removed an air conditioner and entered through a window. Blood recovered from her telephone, with which she struck the rapist, was sent to the state crime lab, which performed DNA[3] analysis and determined the major contributor was a white male. In 2007, the DNA evidence was entered into the Combined DNA Index System (CODIS) and returned a positive match for as-yet unidentified DNA found at the scene of another unsolved Omak crime, the 1998 rape and murder of Susan Burton.

In January 2010, Detective Koplin decided to try a new approach and began interviewing male witnesses identified in the Burton file whose DNA had never been obtained. One was the defendant, Kelly Small. Mr. Small had performed remodeling work at Ms. Burton's apartment and had been given a key. When Detective Koplin contacted him on Friday, January 15, 2010, Mr. Small agreed to speak and came in to see the detective that afternoon. The detective told Mr. Small DNA evidence revealed that the same individual committed both the Burton and Murphy crimes. The detective discussed Mr. Small's connection with Ms. Burton and assured Mr. Small he was not a

---

[2] We use pseudonyms for the victims of rapes discussed in the opinion.

[3] Deoxyribonucleic acid.

2

suspect. But he still asked for addresses where Mr. Small had lived in the past, and Mr. Small provided some. None was close to where Ms. Burton or Ms. Murphy had lived. Detective Koplin also requested and obtained a voluntary DNA sample from Mr. Small.

On the Tuesday after the ensuing three-day weekend, Mr. Small's wife reported Mr. Small missing. He had told her he was going to a building supply store but never returned. She reported that some of his clothing, an electric razor, and the family's all-terrain vehicle (ATV) were missing. Detective Koplin later discovered that Mr. Small sold the ATV in Okanogan on the day he was reported missing for $3,000, after forging his wife's name on the title.

In speaking with Ms. Small, Detective Koplin learned that omitted from Mr. Small's recount of his residential history the prior Friday was the fact that the Smalls lived in an apartment next door to Ms. Murphy's home between 2004 and May 2005. He also learned that Mr. Small's best friend lived across the street from Ms. Murphy's home at the time Ms. Murphy was assaulted.

Ms. Small soon quit responding to Detective Koplin's calls, and on January 30, the detective learned that Mr. Small had returned home. He called Mr. Small, told him he needed to verify his return in light of the missing person report, and traveled to the Small home to see him. There, the detective read Mr. Small *Miranda*[4] warnings and Mr. Small

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

agreed to talk. Mr. Small told the detective he left town because he was stressed about money and needed to get away and think. He said he sold the family ATV for travelling money, drove to Seattle where he left his vehicle, telephone, and keys, and took a flight to Los Angeles, then a bus to Corpus Christie, then Phoenix, and then Las Vegas. From there he took a bus to Wenatchee and another to Spokane, where his daughter picked him up and brought him back to Omak.

When Detective Koplin asked Mr. Small about the whereabouts of his luggage, Mr. Small said he had fallen asleep at the bus station in Las Vegas and his duffel bag was stolen. For several reasons, the detective believed this was a lie. In an interview several days later, Mr. Small admitted he left his duffel bag in his Las Vegas hotel room, explaining, "it was full of dirty clothes, he had a long walk and he didn't want to carry it with him." Report of Proceedings (RP) at 2932.[5] Detective Koplin contacted the hotel, asked that it hold the bag, and arranged for Las Vegas police to collect it as evidence.

That same day, Detective Koplin received results from the DNA sample Mr. Small had provided. The DNA was a match for the blood found on Ms. Murphy's telephone. Mr. Small was arrested on February 2 and charged with the Burton and Murphy crimes.

Upon receiving Mr. Small's duffel bag from Las Vegas police, Detective Koplin

---

[5] All references to the report of proceedings are to the consecutively numbered report that begins with Mr. Small's February 11, 2010 arraignment and continues through trial and sentencing.

4

found that in addition to clothing and a shaving kit, it contained a red spiral notebook and several receipts. One receipt, from a drugstore, reflected the purchase on January 23 of a spiral notebook of the sort found in the bag. Noticing that the front cover and the first page of the spiral notebook had impressions left from writing, Detective Koplin sent it to the state crime lab for analysis. Using oblique lighting and electrostatic detection, crime lab personnel recovered words from the indentations, which they concluded were in letter format and were consistent with someone drafting two letters. They concluded from a handwriting comparison that the impressions were made by Mr. Small.

After receiving images of the indented writing from the crime lab, Detective Koplin pieced together the following phrases from the images of the *inside front cover* of the notebook:

(1) "I'm sorry for everything I put you threw . . . . I put drinking and partying and my friends first. Fuck I hate myself for it . . . she is . . . "
(2) "You were always a great wife and a wonderful mother. I just wish you could say that you had 26 wonderful years, but I know you can't";
(3) "...of your family and both of you take care of your mother. Cody you're the man of the house . . ."
(4) "Please tell your kids that I . . . a . . . wreck so they don't have to go threw life like you two . . . ."
(5) "Savannah and Cody. I'm so sorry . . . I really love you two . . . weren't very old";
(6) "You're great kids and I'm sorry I can't be there for you";
(7) "I know that I will never see my grandkid ever again, victory is an angel, and Cody, I'm sorry that I will never see your son.";
(8) "I'm sorry. You take care of your mother Cody. You're the man of the house now."
(10) [sic] "I wasn't always bad there was some good . . . ."
(11) "By the time . . ."

5

(12) "I'm not going to prison for life, I'm going to hell instead.  I love all of you, Bye!!"

Clerk's Papers (CP) at 451.

Detective Koplin pieced together the following from the images of the *top page* of

the notebook:

(1) "1-26-10";
(2) "To Marla, Savanna, and Cody"
(3) "Why I left because I don't want this to go to court and go on for months in the news + paper.  It better to . . . hit the news paper tonse then tell you what happen 12 years ago"
(4) "It was one of my all night drinking . . . ";
(5) "I really do love all of you . . ."
(6) "I wish I could take that night back . . ."
(7) "I'm so sorry you have all gone threw this mess together . . ."
(8) "I wish I could take that night back . . . I can't . . . I hate myself for what I did . . . I have to remember that night for ever and everything I lost . . .";
(10) [sic] "I'm not going to prison for life because I know no one will visit me..."
(11) ". . . drinking you drink like I did.";
(12) Various words are listed in this section, including: "some day", "you", "I", "will", "know", "hate", "I", "mean", "ask", "me", "don't", "blame", "them", "you" . . .
(13) "take that day back . . ."
(14) "I hate myself";
(15) "—I know—I know that I will never see you . . . Marla, Savanna + Cody.  I really do love you so much and I can't live with out you.  I'm so sorry I have to go know . . ."
(16) ". . . take my life . . ."
(16) [sic] ". . . I really did . . .to grow old with you . . ."
(17) "I really do love you all with all my heart . . . always have . . ."
(18) "Kelly, Dad".

CP at 451-52.

Before trial, and after extensive consideration, the trial court granted Mr. Small's motion to sever trial of the counts related to the Burton crime from prosecution of the 2006 crimes. Mr. Small was eventually charged in this case with the attempted first degree (premeditated) murder of Ms. Murphy, first degree rape, first degree burglary, and forging the ATV title.

Following the severance ruling, Mr. Small moved in this case for an order excluding all evidence of the indented writing. He argued, based on the reference to not wanting to "tell you what happen [sic] 12 years ago," that the writing related to the Burton crime and was irrelevant and prejudicial. The State argued that the writing arguably related to both crimes and could reasonably be construed as a suicide note and goodbye to family members, reflecting consciousness of guilt.[6]

After further extensive consideration, the trial court ruled that the writing from the inside front cover of the notebook—the first 11 phrases set forth above—would be admitted, but that the writing from the notebook's top page—the next 18 phrases set forth above, which spoke of "tell[ing] you what happen[ed] 12 years ago"—would not be.

At trial, the jury heard that Mr. Small's DNA was a match for the blood found on Ms. Murphy's telephone. Ms. Murphy testified that in her effort to repel the rapist, she

---

[6] At trial, the State offered and the court admitted the drugstore receipt found in Mr. Small's duffel bag; the receipt reflected not only the January 23 purchase of a spiral notebook, but the purchase of envelopes and a 32 ounce bottle of Drano as well.

struck him with a rubber mallet and later with the telephone. Mr. Small's sister testified that around the time frame of Ms. Murphy's assault, she observed a gash on the side of Mr. Small's head. Detective Koplin told jurors that in providing a residential history, Mr. Small omitted the fact that he had lived next door to Ms. Murphy. He told jurors that Mr. Small's best friend lived across the street from Ms. Murphy at the time she was assaulted.

Jurors heard that Mr. Small left Omak without any word to his family within days of providing the DNA sample that he knew would be compared to DNA recovered from Ms. Murphy's home. (All evidence concerning the Burton crime was excluded by a court order granting defense motions in limine.) The jury also heard that despite having reported Mr. Small missing, his family did not notify the police when he returned. Detective Koplin told jurors that Mr. Small told two different stories about what happened to his duffel bag. The jury heard about the receipt, the notebook and some of its indented writing—in accordance with the court's ruling, it heard about only the writing found on its inside cover.

On the first day of deliberations, the jury deliberated to guilty verdicts on the charges of first degree rape, first degree burglary, and forgery, and in special verdicts, made findings that Mr. Small's conduct during the rape manifested deliberate cruelty, his victim was particularly vulnerable or incapable of resistance, the burglary was committed with sexual motivation, and was committed at a time when Ms. Murphy was in the home. But it was unable to reach a verdict on the attempted first degree murder charge. In notes

sent to the court by the presiding juror on the second day of deliberations, it was revealed that after reaching a verdict on everything else, juror 12 struggled with the definition of "intent" as it related to the attempted first degree murder charge. The court's response directed jurors to its instruction defining "act[ing] with intent or intentionally," and instructed them to continue deliberating. RP at 2595. After the jury remained deadlocked, the court declared a mistrial on the attempted first degree murder charge.

At sentencing, the court found that an exceptional sentence was warranted for reasons that the parties dispute in part, and that we examine further below. Mr. Small appeals.

## ANALYSIS

### *Forensic evidence of indented writing*

We first address Mr. Small's challenge to the court's decision to admit a portion of the indented writing over his objection. "A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion." *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." *Teter v. Deck*, 174 Wn.2d 207, 215, 274 P.3d 336 (2012).

Before trial, Mr. Small moved to exclude evidence of all of the indented writing on the notebooks. The court and the lawyers recognized in arguing the motion that the remorse and suicidal thoughts reflected in the indented writing on the front cover,

9

including the reference to "not going to prison for life," but "going to hell instead" could reflect consciousness of guilt of the Murphy assault, or the Burton assault and murder, or both, or neither. RP at 451. Mr. Small now argues that because the court knew the writing might relate to multiple events or to another event, the evidence had "zero tendency to make it more or less probable" that it reflected consciousness of guilt for the Murphy murder. Br. of Appellant at 25. He contends the evidence should have been excluded as irrelevant. We disagree.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "The threshold to admit relevant evidence is very low[; e]ven minimally relevant evidence is admissible." *Darden*, 145 Wn.2d at 621.

"It is an accepted rule that evidence of the flight of a person, following the commission of a crime, is admissible and may be considered by the jury as a circumstance, along with other circumstances of the case, in determining guilt or innocence." *State v. Bruton*, 66 Wn.2d 111, 112, 401 P.2d 340, 341 (1965). "The rationale of the principle is that flight is an instinctive or impulsive reaction to a consciousness of guilt or is a deliberate attempt to avoid arrest and prosecution." *Id.*

Likewise, "[V]oluntary statements by one suspected or accused of crime relating to facts or circumstances which indicate a consciousness of guilt . . . are receivable in

10

evidence as admissions against interest." *State v. Barnett*, 70 Wn.2d 420, 424, 423 P.2d 527 (1967). Such statements are admissible "even though explanations from the persons making the statements might well render them less damaging or even innocuous." *Id.*

Finally, "courts have frequently held admissible evidence that the accused, after the crime was committed, attempted to commit suicide." Dale Joseph Gilsinger, Annotation, *Admissibility of Evidence Relating to Accused's Attempt to Commit Suicide*, 73 A.L.R.5th 615 (1999). Thoughts of suicide and threats of suicide have been held admissible on the same rationale. *Id.* at §§ 4-5 (citing cases).

Evidence that days after Mr. Small provided DNA to compare to the Murphy crime scene he wrote an apparent suicide note, expressing remorse and a desire not to go to prison, unquestionably has a tendency to make it more probable that he committed the crime than it would be without the evidence. The fact that he might have another explanation for the note does not make it irrelevant. *Cf. State v. Piche*, 71 Wn.2d 583, 585, 430 P.2d 522 (1967) (that defendant may, at the time of escape, be charged for other offenses, "does not render proof of the escape irrelevant"). The fact that damaging evidence "might induce one on trial for a crime to take the witness stand in explanation of it gives no ground for excluding such evidence, for this objection could be made against nearly all competent and material evidence tending to establish guilt or tending to connect the defendant with . . . events and circumstances from which guilt may reasonably be inferred." *Barnett*, 70 Wn.2d at 424.

11

The trial court did not err in finding the evidence relevant.

Mr. Small argues, alternatively, that the evidence should have been excluded under ER 403 because its probative value was substantially outweighed by the danger of unfair prejudice or misleading the jury. "'"[U]nfair prejudice" is that which is more likely to arouse an emotional response than a rational decision by the jury.'" *State v. Cronin*, 142 Wn.2d 568, 584, 14 P.3d 752 (2000) (alteration in original) (quoting *State v. Gould*, 58 Wn. App. 175, 183, 791 P.2d 569 (1990)).

While Mr. Small characterizes his argument as concerned with unfair prejudice, his real contention is that the State misled the jury because it did not disclose that Mr. Small could have been concerned about the fact that his DNA was going to be compared with evidence found at the Burton murder scene. The State wanted to tell the whole DNA story, and it argued that it should be able to, relying on the res gestae and common scheme and plan exceptions to ER 404(b). But over the State's opposition, the defense successfully moved for orders in limine excluding evidence about Ms. Burton, her murder, any other pending charges against Mr. Small, or any DNA analysis other than that tying him to the Murphy assault. If the State "misled" the jury, it was because Mr. Small asked that evidence about his full understanding of the planned DNA analysis be withheld from jurors.

The in limine rulings did not prevent Mr. Small from offering evidence that he had a different, and thereby relevant and admissible concern when he fled: viz., that he was

12

concerned about his DNA being compared to evidence found at the scene of the rape and murder of Ms. Burton, not about it being compared to evidence found at the scene of the crime against Ms. Murphy. Even without Mr. Small taking the stand, his lawyer could have inquired of Detective Koplin about this relevant, admissible other reason why his client might have been remorseful, suicidal, and talking about going to hell rather than to prison. The State would not have objected on ER 404(b) grounds.

For obvious reasons Mr. Small did not offer the evidence, but what is important is that he could have. In the context of flight evidence, the prevailing view is that it may be offered even if the defendant contends his flight was motivated by conscious guilt of a different offense, even if offering that explanation "puts a defendant at an enormous disadvantage." Clifford S. Fishman, 2 JONES ON EVIDENCE § 13:5, at 477 (7th ed. 1994).[7]

If a defendant has an innocent or mitigating explanation for evidence that might otherwise incriminate, he or she must decide whether or not to take the stand. *Ohler v.*

---

[7] Where evidence of flight could be explained by any of several pending charges against a defendant, the treatise explains:

> The prevailing view appears to favor admissibility, leaving it to the jury to decide the weight the evidence is to be given. This obviously puts a defendant at an enormous disadvantage: to explain, during his trial for a particular crime, that he fled or escaped to avoid trial for an unrelated crime, is not likely to win much sympathy from the jury, while revealing evidence of an uncharged act that otherwise would be inadmissible.

Fishman, *supra*, at 477-78.

13

*United States*, 529 U.S. 753, 757, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (2000). "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow." *McGuatha v. California*, 402 U.S. 183, 213, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971) (citing *McMann v. Richardson*, 397 U.S. 759, 769, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).

We reject Mr. Small's contention that his decision not to offer evidence of a different source of guilt and remorse rendered evidence of the indented writing unfairly prejudicial.

*Sexual motivation enhancement*

Mr. Small next argues the trial court erred when it added 24 months to his total period of confinement under RCW 9.94A.533(8) because the statute authorizes (and mandates) additional time where there is a finding of sexual motivation only "for felony crimes committed on or after July 1, 2006." The burglary of Ms. Murphy's home, alleged and found to be sexually motivated, occurred in February 2006.

The State concedes that the mandatory 24-month addition to the sentence was not authorized given the date of the crime, but points out that the State had also asked the court to impose an exceptional sentence in light of the jury's finding of sexual motivation for the burglary. Because an addition to the sentence would be authorized as an exceptional sentence under RCW. 9.94A.535(3)(f), the State argues that the erroneous reliance on RCW 9.94A.533(8) was harmless. It argues that remand "is necessary only if

14

it is not clear whether [the] trial court would have imposed the same sentence based on valid factors alone" and contends that in this case, "the court's intent to impose [an] exceptional sentence[ was] clear." Br. of Resp't at 35-36 (citing *State v. Smith*, 82 Wn. App. 153, 161, 916 P.2d 960 (1996)).

It is not clear to us that the court would have imposed a discretionary exceptional sentence based on the sexual motivation finding. The court did not increase Mr. Small's sentence at all based on one of the aggravating circumstance found by the jury (that Ms. Murphy was in her home at the time of the burglary), and in orally announcing its sentencing decision, it thrice characterized the 24-month increase for the sexual motivation finding as mandatory, not discretionary. *See* RP at 2817-18 ("The Court is also required to add," "There's a 24-month required for," and, "The Court is also required to impose an additional sentence, under 9.94A.533(8) because of sexual motivation involved in the burglary.").

We find no indication that the trial court would have imposed an exceptional sentence for the burglary count[8] had it realized that the addition of 24 months presently required by RCW 9.94A.533(8) did not apply. We remand for resentencing on the burglary count.

---

[8] The trial court would have to impose 267 additional months for the burglary conviction to reach the same sentence of 380 months, since it ran the burglary sentence concurrently.

15

*Constitutionality of instruction that jurors may have a "duty"
to find guilt*

Finally, Mr. Small argues that the trial court committed manifest constitutional error reviewable for the first time on appeal when it instructed the jury that "[i]f you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." CP at 197. He acknowledges that Division One of this court rejected his arguments in *State v. Meggyesy*, 90 Wn. App. 693, 958 P.2d 319 (1998), *abrogated on other grounds by State v. Recuenco*, 110 P.3d 188, 154 Wn.2d 156 (2005), but submits that *Meggyesy* was wrongly decided. Br. of Appellant at 29-30 n.21.

Mr. Small makes this argument in an opening brief filed in June 2013. This appeal was thereafter stayed because of a possible public trial issue that had been presented for resolution in other cases and is now moot.

In the meantime, Mr. Small's challenges to the pattern instruction have been rejected by each division of this court at least twice. *State v. Moore*, 179 Wn. App. 464, 318 P.3d 296 (2014) (Division One); *Meggyesy*, 90 Wn. App 693 (Division One); *State v. Bonisisio*, 92 Wn. App 783, 964 P.2d 1222 (1998) (Division Two); *State v. Brown*, 130 Wn. App. 767, 124 P.3d 663 (2005) (Division Two); *State v. Wilson*, 176 Wn. App. 147, 307 P.3d 823 (2013) (Division Three); and *State v. Nicholas*, 185 Wn. App. 298, 341 P.3d 1013 (2014) (Division Three). In *Nicholas*, 185 Wn. App. 298, this court opened its

16

opinion, "'We thought that this issue was resolved.'" *Id.* at 299 (quoting *State v. Moore*, 179 Wn. App. 464, 465, 318 P.3d 296 (2014).

At this point, it has been resolved.[9] The trial court did not err in giving the pattern to-convict instruction with its "duty to return a verdict of guilty" language.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Small raises four. Some are raised for the first time on appeal: his second (that Detective Koplin ignored Mr. Small's request to call his lawyer at the time he provided the court-ordered saliva sample) and portions of his third (that juror 12 reached verdicts on rape, burglary and forgery without understanding the meaning of "intent" and that the jury's deliberations on those three counts were too short to be fair). "RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them." *State v. Guzman Nunez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011), *rev'd on other grounds*, 174 Wn.2d 707, 285 P.3d 21 (2012) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). We will entertain only those grounds raised by Mr. Small's SAG

---

[9] Mr. Small states that in *State v. Smith*, 174 Wn. App. 359, 298 P.3d 785 (2013), we suggested that the term "should" is a better term in the context of describing the State's burden of proof than is "duty." Br. of Appellant at 48-49. But in *Smith*, we were presented with an instruction that if the jury had a reasonable doubt it "should" return a verdict of not guilty, instead of that it had a "duty" to do so. The instruction in that case presented a risk that jurors could conclude from the court's instruction that "while jurors with lingering doubts *should* return a verdict of not guilty, they did not have to." *Smith*, 174 Wn. App. at 369. *Smith* has no application here.

17

that were preserved.

*Unlawful search and seizure: second buccal swab.* Several weeks before trial, the State filed a motion for an order requiring Mr. Small to provide a sample of his saliva for DNA testing, despite already having the sample he voluntarily provided in 2010.

"Swabbing a cheek to procure a DNA sample constitutes a search under the Fourth Amendment [to the United States Constitution] and article I, section 7" of the Washington Constitution. *State v. Garcia-Salgado*, 170 Wn.2d 176, 184, 240 P.3d 153 (2010). Warrantless cheek swabs are per se unreasonable under both constitutions. *Id.* CrR 4.7(b)(2)(vi) creates a limited exception to the warrant requirement and permits a trial court to order a criminal defendant to allow the State to take samples from the defendant's body where the following requirements are met:

> [A] CrR 4.7(b)(2)(vi) order must be entered by a neutral and detached magistrate; must describe the place to be searched and items to be seized; and must be supported by probable cause based on oath or affirmation; and there must be a clear indication that the desired evidence will be found, the method of intrusion must be reasonable, and the intrusion must be performed in a reasonable manner.

*Garcia-Salgado*, 170 Wn.2d at 186.

Mr. Small argued in opposition to the State's motion that since the State already had possession of a sample for DNA testing, it must show an actual need for a further sample. The State's motion had expressed only vague concerns, based on Mr. Small's retention of a consulting DNA expert and certain defense requests, that Mr. Small might

18

challenge the validity of the earlier-provided sample and testing. The State conceded it was unaware of any problem with its testing, which it would have been required to reveal.[10]

The trial court found that the State had made the showing required by CrR 4.7(b)(2)(vi) and *Garcia-Saldago*, including by demonstrating probable cause through Detective Koplin's sworn probable cause report and the affidavit of a deputy prosecutor. The court's principal concern was with delay and possible prejudice to Mr. Small; in that connection, it ordered Mr. Small to provide the sample but reserved the right to suppress the further analysis if it unfairly prejudiced Mr. Small or did not permit adequate trial preparation.

The trial court "[found] no legal authority supporting Defendant's argument that the State must show necessity or certainty for collecting another saliva sample. The State's purpose is reasonable. No showing beyond that is required." CP at 609.

In his SAG, Mr. Small renews this argument and also argues conclusorily that the State did not demonstrate facts and circumstances supporting a reasonable inference that he was probably involved in criminal activity and that evidence of the crime could be

---

[10] The defense later argued to the jury at trial that the initial DNA testing was suspect due to a contamination issue that arose in connection with some of the crime lab work, and because Mr. Small's original buccal swab had been sent to the lab along with a swab from another suspect.

found at the place to be searched. *See State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008).

The probable cause report and prosecutor's affidavit demonstrate probable cause. The argument that the State was required to demonstrate an actual need for the second sample continues to suffer its original infirmity: Mr. Small still lacks any legal authority that supports the argument. The court did not err in granting the State's motion.

*Juror misconduct.* It was reported by the presiding juror on the second day of deliberations that juror 12 wanted a further definition of "intent" and later, that juror 12 admitted to fellow jurors that he looked up "intent" in a dictionary the night before. Mr. Small contends that this juror misconduct deprived him of a fair trial and the court should have declared a mistrial on all counts. Mr. Small moved for a mistrial in the trial court based on juror 12's misconduct but he suggested "alternatives" and arguably agreed with the course of action ultimately taken by the court. RP at 2747, 2751. We will nonetheless consider this issue.

A trial court should grant a mistrial when an irregularity in the trial proceedings is so prejudicial that it deprives the defendant of a fair trial. *State v. Babcock*, 145 Wn. App. 157, 163, 185 P.3d 1213 (2008). Because the trial judge is in the best position to determine the prejudice of circumstances at trial, an appellate court reviews the decision to grant or deny a mistrial for abuse of discretion. *Id.*

In this case, the trial court refused to declare a mistrial because its instruction 11 to

20

the jury defined when "[a] person acts with intent or intentionally," the jury had deliberated to a verdict on three of the counts before juror 12 consulted the dictionary, and the trial court intended to remind jurors to follow instruction 11. CP at 199 (Jury Instruction 11). The court explained to counsel that it viewed the misconduct as harmless, "because they have to use [the court's] definition." RP at 2749. It then called in the jury and told them, in part:

> Intent is defined in Instruction number 11. You must base your decision on the instructions and evidence you have received. So the definition of intent that you must use, the legal definition of intent is . . . in Instruction 11. The law does not permit me to give you any other instruction about the definition of intent, or to interpret that instruction for you. This is the definition of intent. Please use Instruction number 11.
> The jury will go back to the jury room and continue deliberating, please.

RP at 2755.

Among the factors examined in determining whether a trial irregularity deprived a defendant of a fair trial is whether the irregularity can be cured by an instruction—an instruction that the jury is presumed to follow. *Babcock*, 145 Wn. App. at 163. The trial court's direction to the jury to use the definition in instruction 11 could not have been clearer, and we presume it was followed. The trial court did not abuse its discretion in denying the motion for a mistrial.

*Unlawful search and seizure of duffel bag.* Finally, Mr. Small renews his argument made in the trial court that the warrantless search of his duffel bag was

21

improper because he never abandoned it. He claims to have had a reasonable expectation of privacy in luggage left behind in a hotel room, given the hotel's policy of holding items in lost and found for 30 days. He asks us to reverse and remand for a new trial at which the evidence discovered in the bag will be excluded.

Courts employ a two-prong test to determine whether a defendant had a reasonable expectation of privacy in the contents of items searched: "(1) Did he 'exhibit an actual (subjective) expectation of privacy by seeking to preserve something as private?' and (2) '[d]oes society recognize that expectation as reasonable?'" *State v. Evans*, 159 Wn.2d 402, 409, 150 P.3d 105 (2007) (alteration in original) (quoting *State v. Kealey*, 80 Wn. App. 162, 168, 907 P.2d 319 (1995)).

When denial of a motion to suppress is challenged, we review the trial court's findings of fact under the substantial evidence standard and review its conclusions of law de novo. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. *Id.* Unchallenged findings are verities on appeal. *Id.*

Mr. Small has failed to designate the trial court's findings and conclusions on the suppression motion as part of the record on review, so we rely on the findings and conclusions stated by the trial court when it orally denied the motion. *See* RP at 606-09. We note that Mr. Small improperly relies on the trial record for this argument on appeal. The only evidence we consider in reviewing a pretrial decision is the evidence that was

22

presented to the court in connection with the motion.

Luggage is recognized as a "'traditional repository of personal belongings protected under the Fourth Amendment.'" *Evans*, 159 Wn.2d at 409 (quoting *Kealey*, 80 Wn. App. at 170). But even for items in which a reasonable expectation of privacy exists, "One of the exceptions to the warrant requirement is for voluntarily abandoned property." *Id.* at 407.

There is a reasonable expectation of privacy in a motel room during one's tenancy, but "[t]his expectation . . . does not survive the expiration of the tenancy, unless the motel has accepted late payment and/or tolerated overtime stays in the past." *State v. Davis*, 86 Wn. App. 414, 419, 937 P.2d 1110 (1997).

The trial court found that Mr. Small stayed at the Las Vegas hotel for approximately seven days and left without paying for the last day's charge for his room, taking some property with him, but leaving his duffel bag behind. The court found that when interviewed by police, Mr. Small said he left the bag behind because it was just dirty clothes. Substantial evidence supports these findings.

The trial court perceived Mr. Small as conceding he knew or should have known that the hotel would open and inventory the bag, but in any event, the trial court found that to be the only reasonable expectation:

> When you leave something behind at a hotel, they're going to open it up
> and look at it. You do not expect it to be held privately. You're not—You
> just abandon it. You left it there. The hotel doesn't have any obligation to

23

not let anybody look at it. The reason the hotel holds onto is to avoid—to provide it to the customer who happens to leave something behind, and they have a blanket policy, apparently, whether it's your cell phone cord, your shaver, one of your bags, whatever it is, they keep it up to 30 days, but you don't have privacy in it because they look at it, they inventory it. They don't assume any obligation for holding it privately. They don't assume any—holding it in privacy.

. . . .

So there's no—The defense has offered no evidence that he expected the bag to be preserved as private, or that he intended to retrieve it. There is no evidence that society would recognize the privacy of a duffel bag abandoned in these circumstances. There just is no privacy issue here.

RP at 607-09.

The trial court's findings support its conclusion that the duffel bag was abandoned.

We affirm the convictions and remand for resentencing on the burglary count.[11]

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Pennell, J.

---

[11] Because Mr. Small partially prevailed, his motion asking that we deny the State costs on appeal is moot.

24